UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

SUSAN MEAD,                           :
                                      :
          Plaintiff,                  :
                                      :
          v.                          :    Case No. 2:05-cv-332
                                      :
RELIASTAR LIFE INSURANCE COMPANY,     :
                                      :
          Defendant.                  :
                                      :

## Opinion and Order

Plaintiff Susan Mead has sued Defendant ReliaStar Life
Insurance Company ("ReliaStar Life") for failure to pay long-term
disability ("LTD") benefits.  She seeks a declaration that she is
entitled to LTD benefits under her former employer's policy, plus
interest, costs and attorney's fees.  On the parties' cross-
motions for summary judgment, Mead's Motion for Summary Judgment,
ECF No. 85, is **granted in part**; Reliastar Life's Motion for
Summary Judgment, ECF No. 88, is **denied**; the matter is remanded
to the plan administrator for further proceedings consistent with
this opinion.

## I.  Background

The following facts are undisputed, except where noted, and
are taken from the record of the plan administrator's
proceedings, as well as former proceedings in this Court.

### A.  The Claimant

Mead worked for ReliaStar Financial Corp. ("ReliaStar

Financial") from August 1978 to December 31, 2000.  R. at 2486.
At the time she ceased working for ReliaStar Financial at age 50,
she held an executive position as a Vice President of Strategic
Marketing under a written employment contract dated November 20,
1999, entitled Management Employment Agreement ("MEA").  R. at
395-408.  According to her job description, the overall purpose
of her position was to "oversee[] and develop[] the internal and
external communications and community relations programs of the
company."  R. at 349.  To that end, she was required to

> [d]evelop and execute an integrated strategy for
> communicating enterprise strategies, plans, objectives,
> programs, activities and announcements to various
> internal and external audiences[; d]esign[] and
> implement[] public relations and advertising programs
> to enhance the company's image and identity within the
> industry and community[; and s]elect[], train[],
> motivate[] and direct[] staff to accomplish the
> objectives of the various communications/community
> relations programs.

*Id.*  The job description noted that it covered the principal
duties of the job, but was not intended to provide details
concerning the accomplishment of these tasks.  *Id.*

Mead stated that her position reported to the CEO of
ReliaStar Financial, and that she served on the boards of key
subsidiaries located in Minneapolis, Seattle, and Jericho, New
York.  R. at 2863-64.  Her job involved participating in meetings
for a substantial part of her day, extensive work at a computer,
and frequent air travel.  R. at 230, 2863.  Her work day
frequently extended beyond eight hours.  R. at 202-03.  The

parties agree that Mead's position was essentially a sedentary occupation, that allowed her some flexibility to change her position and to stand up for brief periods during the course of her work day.  R. at 230, 2931.

During 2000, ReliaStar Financial entered into a plan of merger with ING Groep, N.V. ("ING"), a financial services company located in the Netherlands.  On December 31, 2002, ReliaStar Financial was merged into Lion Connecticut Holdings, Inc. ("Lion Connecticut").  Lion Connecticut became a wholly-owned subsidiary of ING America Insurance Holdings, Inc., which ING then acquired.

Mead's MEA was intended to protect her in the event of a change of control at ReliaStar Financial.  It provided for payments to her following a change of control if her employment was terminated, and entitled her to participate in any health, disability or life insurance plan as though she continued to be an executive of the company for three years following her termination or until her sixty-fifth birthday, whichever occurred earlier.

In connection with the corporate acquisition of ReliaStar Financial, Mead exercised her option to stop working for the company as of the end of 2000, and to receive payment under the terms of the MEA.  She received a lump sum payment of $819,783.33 in 2001 under the MEA, as well as additional sums as deferred compensation or bonuses.  R. at 524.  Mead's total compensation

in 2000 was $283,734.38, reflecting a salary of $192,450.00 plus
a bonus of $91,284.38.  R. at 508.

**B.    The Long Term Disability Policy**

ReliaStar Life Insurance Company ("ReliaStar Life") issued a
Group Policy ("the Plan") to ReliaStar Financial to provide LTD
insurance to its employees.  As an employee, Mead was covered
under the Plan, and according to the terms of her employment
agreement her coverage continued for three years following the
termination of her employment.  According to the Plan, in order
to qualify for LTD benefits a covered individual must

> be insured on the date you become disabled and the
> condition causing your disability is not excluded from
> coverage[;] be insured on the date the benefit waiting
> period begins[;] send written notice of the disability
> within one year of the date you become disabled[; and]
> . . . be receiving regular and appropriate care and
> treatment intended to aid your recovery and your return
> to work.  Regular and appropriate care and treatment
> means supervised care or treatment by a doctor for the
> sickness or accidental injury causing your disability.

R. at 15.  "Total Disability" is defined as

> [1)] until you have qualified for monthly income
> benefits for 24 months, you are unable to do the
> essential duties of your own occupation, due to
> sickness or accidental injury[; 2)] after you have
> qualified for monthly income benefits for 24 months,
> you are unable to work at any occupation you are or
> could reasonably become qualified to do by education,
> training or experience.

R. at 23.  The Plan also specifies a "Benefit Waiting Period" of
twenty-six weeks, "the length of time you must be continuously
disabled before you qualify to receive any benefits. . . . The

benefit waiting period begins on the first day you see a doctor
and he or she states in writing that you are disabled because of
sickness or accidental injury."  R. at 15.

The Plan's Schedule of Benefits provided that for Total
Disability an individual would ordinarily be covered under a Base
Plan which provided a Monthly Income Benefit of "[t]he lesser of
40% of your Basic Monthly Earnings or $15,000.00, minus Other
Income."  R. at 12.  Basic Monthly Earnings was defined as
"salary or wage you receive for work done for the Policyholder."
*Id.*  Basic Monthly Earnings included bonuses "for those employees
with a written bonus agreement that is specifically based on
sales of ReliaStar Financial . . . products and/or products of a
ReliaStar Financial . . . subsidiary," but did not include, among
other things, incentive compensation.[1]  *Id.*  According to the
Plan, "Other Income" includes among other things federal and
state social security and disability benefits, "[s]alary
continuance benefits provided through your employer; and
"[s]alary, commission, bonus or any other income you earn from
any work while receiving benefits, except as explained for
Residual Disability or the Rehabilitative Work Benefit;" and
"voluntarily selected" early retirement benefits.  R. at 15-16.

––––––––––

[1]  The record does not reflect that Mead had a written bonus
agreement specifically based on sales of ReliaStar Financial
products and/or products of a ReliaStar Financial subsidiary.  It
does appear that at least some of the bonuses Mead received over
the years were incentive compensation.  R. at 536.

If the receipt of "Other Income" reduced the benefit to less than $50.00, the Plan provided that a minimum monthly income benefit of $50.00 be paid.  R. at 13, 16.

ReliaStar Financial is listed as the Plan Administrator, but the Plan in fact is administered by ReliaStar Life.  ReliaStar Life processes the claims, makes payments or issues notices of denial, reviews claim denials and issues final determination of a claim.  It "has final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of" the Plan.  R. at 25.

**C.   Mead's Claim**

On January 28, 2003, Mead, then 52, submitted a claim for LTD benefits to ReliaStar Life, based on degenerative cervical disc disease.  She indicated that she first noted symptoms of this condition in 1988 and began seeing a physician at around that time, that this condition began around 1995 and that the degeneration was ongoing.  Her claimed date of disability was January 28, 2003, the date she submitted her claim.  The parties agree that Mead would be eligible for LTD benefits during the "own occupation" period of the Plan if she was "totally disabled" from her own occupation continuously from January 28, 2003 through July 29, 2005.

In connection with her claim, Mead provided a statement of her daily living activities, in which she described constant back

6

and neck pain over the past two years.  R. at 351-54.  She was able to exercise, drive, shop and do housework, although heavy cleaning exacerbated her pain.  Any activity that put stress on her neck however, including periods of sitting, was tiring and increased her pain.  R. at 352-53.  Mead stated that she could not sit for longer than one hour without a substantial increase in pain, and that she could not stand or lift without pain.  R. at 354.

Mead's attending physician Dr. Hannah Rabin, a family practice physician, completed a Statement of Impairment and Function, dated February 26, 2003, for her claim.  Dr. Rabin listed Mead's primary diagnosis as degenerative disc disease. Dr. Rabin noted that Mead could tolerate sitting for three to four hours, standing for one to two hours, and walking for one to two hours.  R. at 365.  Dr. Rabin estimated that Mead could return to work part-time by January 1, 2004, and full-time by March 1, 2004 with frequent changes of position and rest.  R. at 365A.

Mead submitted medical records from Dr. Rabin, Dr. Carol Nelson, an internist who saw Mead in 2000 and 2001, Drs. Chi Chi Lau and Bonita Libman, rheumatologists who saw her in 2002, and Dr. Michael Borrello, a pain management specialist who saw her in 2003.  A magnetic resonance imaging ("MRI") test in January 2001 showed moderately severe degenerative disc disease at multiple

levels of Mead's cervical spine.  She received no reduction in pain from an epidural steroid injection in February 2003, and underwent a medial branch nerve block in April 2003, which gave her some limited relief.  In May 2003 Dr. Borrello performed a selective nerve root injection.  R. at 651-52, 656, 661, 665.

Dr. Rabin referred Mead to the Spine Institute of New England in April 2003.  Mead saw Dr. S. Elizabeth Ames of the Spine Institute in May 2003.  Dr. Ames reviewed the 2001 MRI and x-ray films, and obtained new cervical spine films.  The 2003 films showed malalignment of the cervical spine with severe degenerative changes.  R. at 671.  The films from 2001 and 2003 showed essentially the same condition.  Dr. Ames confirmed a diagnosis of multilevel degenerative cervical discs with pain resulting from the disc degeneration.  R. at 670.  She discussed surgical intervention with Mead, and offered to set up an evaluation with a surgeon who performed cervical fusions, but felt that this would not provide Mead with complete relief because of the multiple levels of discs involved.  R. at 666.

ReliaStar Life contracted with an outside medical consultant from Behavioral Management, Inc. ("BMI") to review Mead's claim. Dr. Mark Johnson, an internist, reviewed Mead's medical records and her application for LTD benefits, and had a fifteen minute telephone conversation with Dr. Rabin.  Dr. Johnson reported that Dr. Rabin did not find that Mead could not work at a sedentary

8

job, that she felt that "mental health issues" were an integral part of her complaints of pain and constituted the "true reasons why Ms. Mead is not motivated, or perceives herself as unable to return to work." R. at 301.[2] Dr. Johnson concluded Mead's inability to tolerate extended periods of sitting, standing or walking "are not supported by any objective evidence in the medical records." R. at 302. In Dr. Johnson's opinion, the MRI findings would not ordinarily indicate substantial impairment from a sedentary occupation, nor would Dr. Rabin's restrictions on sitting, standing or walking prevent Mead from working at a sedentary job. *Id.*

Dr. Scott M. Yarosh, a psychiatrist affiliated with BMI, reviewed Mead's claim from a psychiatric and medical perspective. He reviewed the medical record from Dr. Ames, and Dr. Johnson's

---

[2] Dr. Rabin contended that Dr. Johnson misconstrued their conversation, and stated in a letter dated February 17, 2004 to Mead's attorney and provided to ReliaStar Life:

I believe that Ms. Mead has suffered greatly from her chronic pain and that she in addition has suffered from depression which has now resolved. She did have significant pain during the time of her depression and I do believe that her moods were affected by her pain but this is not to say that her chronic pain is due to her depression. In fact her chronic pain long preceded her depression and now that her depression has resolved, she continues with severe daily pain. . . . I believe that the insurance medical consultant did not accurately report the medical opinions which I expressed and that the telephone conversation was conducted in a very informal manner during which I at no time suggested that depression was the cause of Ms. Mead's chronic pain.

R. at 208.

report, and he contacted Mead's psychiatrist, Dr. Mark Schultz, with a series of questions that assumed Mead was seeking disability benefits based on an impairing psychiatric condition. Dr. Shultz responded that Mead was applying for disability benefits due to her physical condition and not to any psychiatric disorder.  He found no evidence that any psychiatric condition or disorder played a causative role in her physical disability and pain.  On the contrary, he stated:  "the chronicity of and incapacitation from her physical problems are clearly precipitating and exacerbating factors to her psychiatric distress. . . . However much Ms. Mead may have suffered recently from depressed mood and sleep difficulties, the origin of her disability is physical."  R. at 293.

Dr. Yarosh concluded that Mead did not have a psychiatric impairment, and he agreed with Dr. Johnson that she did not have a physical impairment.  He speculated, however, that she might be experiencing psychological distress that was manifesting as physical symptoms.  R. at 282-83.

On August 28, 2003, ReliaStar Life denied Mead's claim for LTD benefits.  The benefit specialist who handled her claim detailed the information reviewed and concluded that Mead's medical records "do not support total disability from your own occupation as a M/C IV Communications/Community Relations Executive."  R. at 253.

**D.   Mead's Appeal**

Mead appealed the denial.  The appeal committee permitted Mead to submit additional information, and she provided a supplemental report from Dr. Rabin, the results of a Functional Capacity Evaluation ("FCE") conducted in October 2003, and a Vocational Analysis Report.  Mead also provided additional medical records from Dr. Ames and Dr. Borrello.

Mead underwent an interdisciplinary work rehabilitation evaluation in July 2003 at the Fletcher Allen Work Enhancement Rehabilitation Center ("WERC"), and participated in a three-week program of work hardening in August 2003 that included physical and occupational therapy, as well as counseling.  On July 22, 2003, WERC's occupational therapist reported that Mead was "currently unable to work due to significantly decreased positional tolerances of sitting, standing and walking, stooping, reporting all of these cause increased pain just after a short time of being in this position."  R. at 688.

Mead attended half-day sessions, five days a week.  After the second week of sessions, as of August 15, 2003, the WERC occupational therapist noted that despite "improvement in her cervical flexibility and upper quadrant strength," Mead had not yet reached the functional tolerances necessary to return to her work.  R. at 700.

As of August 21, 2003, the WERC data collection forms showed

11

Mead reporting that her tolerance for sitting, standing, walking and driving had improved as a result of participation in the program.[3]  R. at 120.  The program notes state that she made excellent progress in the program and gained strength and flexibility, although she had not achieved full functional tolerances of activities necessary to return to work, such as sitting for five to six hours intermittently, working at a computer for two hours at a time, or driving for four hours.  R. at 707.  The progress notes of Mead's psychological evaluation and counseling sessions reflect that she exhibited symptoms of depression, pain-related anxiety, and concern that her pain was chronic in nature.  R. at 124, 127.  At her follow-up discharge evaluation on September 29, 2003, the notes reveal that Mead had taken on part-time volunteer work, but remained unable to sit for extended periods.  The physical therapist opined that Mead might have a hard time re-entering the work force unless she could work in a non-sedentary occupation.  R. at 714.

In October 2003 Mead completed a three-hour FCE at WERC. The evaluator found that Mead was capable of working at the sedentary physical demand level, but that this physical demand

---

[3]  The WERC data collection forms show reported positional tolerances on July 1, 2003 of 30 minutes for sitting, 30 minutes for standing, 60 minutes for walking and 15 minutes for driving. On August 21, 2003, Mead's reported positional tolerances were 120 minutes for sitting, 60 minutes for standing, 120 to 180 minutes for walking and 180 minutes for driving.  R. at 120.

level is established by one's lifting capacity alone.  She
estimated that Mead could sit for fifteen minutes at one time,
stand for twenty minutes and walk for one hour, and that over an
eight-hour day she could sit or stand for two hours, walk for two
and one-half hours, and that she would need to lie down for pain
management for one to one and one-half hours.  R. at 153.  Given
that a six-hour sitting tolerance is typically required for
sedentary work, and Mead had limited sitting tolerance, the
evaluator felt she would be a better match for jobs that
minimized sitting and allowed her to change positions frequently.
Mead's stamina would at that time allow her to work for four
hours per day, three to five days per week.  R. at 139.

     In connection with Mead's claim, ReliaStar Life's Clinical
Case Manager reviewed her evaluation and treatment records from
WERC.  R. at 90-95.  The reviewer noted that Mead was evaluated
for the multidisciplinary work hardening program by a physical
therapist, an occupational therapist and a psychologist, who
agreed that she was a good candidate for the comprehensive work
hardening program; and that she attended the program, a one-month
follow-up comprehensive re-evaluation, and the FCE.  The
reviewer's task was to determine the significance of the initial
clinical findings, Mead's compliance, whether or not there was
progress in response to treatment, and the validity of her FCE
and final recommendations.  The reviewer's summary indicated that

13

Mead had put forth good efforts in the program, and had demonstrated "significant improvement in her overall functional abilities from the date of her initial evaluation through her FCE." R. at 95. Mead's physical capacities following the work hardening program were assessed based on part-time work, and the reviewer concluded that the FCE conclusions and recommendations were "valid based on the test findings." *Id.*

In March 2004 Mead engaged in a vocational analysis with Cynthia J. Ward of Chrysalis Case Management. Through a telephone interview with Mead, review of medical records and analysis of the most analogous occupation from the Dictionary of Occupational Titles from the United States Department of Labor, Ward concluded that Mead had the capacity to work part-time, with a limited tolerance for sitting, and that because of this limitation she cannot "perform the vigorous, full-time responsibilities of her previous occupation." R. at 233.

In April 2004, Mead had another MRI, which again confirmed multilevel degenerative disc disease, involving the C3-4, 4-5, 5-6 and 6-7 levels. R. at 761.

As of June 2004, Mead's appeal file was considered complete, and the appeal committee retained physician and attorney Dr. Mitchell Nudelman to perform a medical record review. Dr. Nudelman, a primary care physician, stated that he consulted with an unnamed rheumatologist and an unnamed physician board-

14

certified in occupational and internal medicine.  According to
Dr. Nudelman, the rheumatologist agreed with the diagnosis of
degenerative disc disease, but opined that Mead was not totally
lacking in work capacity, and that the restrictions or
limitations claimed were inconsistent with her daily living
activities and the objective medical findings.  According to Dr.
Nudelman, the occupational medicine specialist was skeptical of
the conclusions in Mead's FCE.  The specialist found that Mead
had "a longstanding diagnosis of 'fibromyalgia,'"[4] felt that the
FCE conclusions were "difficult to justify," and noted that Mead
engaged in significant physical exercise.  The occupational
medicine specialist found insufficient information to support
Mead's contention that she could not perform her job as executive
manager.  Accordingly, Dr. Nudelman gave his opinion that there
was insufficient clinical documentation to support Mead's claim
that she was unable to perform the essential duties of her own
occupation.  R. at 60-63.  Neither Dr. Nudelman nor his
unidentified consulting physicians were provided with ReliaStar
Life's internal review of the WERC program that indicated Mead's
part-time work limitations were valid based on the WERC program's
test findings.  R. at 95.

---

[4]  Several years prior to the date Mead sought disability
benefits, she received a diagnosis of fibromyalgia.  Mead has not
sought a disability determination based on her previous history
of fibromyalgia.

In a letter dated August 13, 2004, the appeal committee
upheld the initial decision denying benefits.  The letter
summarized the conclusions of the reviewing physicians that the
overall evidence did not support a conclusion that Mead lacked
the capacity to work at her own occupation as of January 28, 2003
and for twenty-six weeks thereafter.  The committee noted that
Mead's condition did not appear to have changed between December
2000--when she last worked--and January 2003.  The committee also
noted that Mead's ability to sustain a five-day regimen of
exercise indicated stamina and a high level of physical ability,
which it felt was inconsistent with someone who could not perform
sedentary work and suffered disabling pain.  The committee noted
the FCE recommendation that Mead may be best suited for
employment which would allow her to alternate sitting and
standing positions,[5] and stated that Mead's occupation afforded
her the opportunity to alternate sitting and standing at will.
R. at 54-56.

**E.   Mead's Lawsuit**

Mead filed suit against ReliaStar Life on December 29, 2005,
seeking recovery for LTD benefits, pursuant to Section
502(a)(1)(B) of ERISA.  *See* 29 U.S.C. § 1132(a)(1)(B).  The

---

[5]   The FCE report actually concluded that Mead "would be
most successful in a job that minimized sitting and allowed her
to walk and stand as needed. . . . Initially she should attempt a
3 day a week schedule, with a day off in-between, and gradually
work up to 5 days per week.  R. at 140.

United States Magistrate Judge, exercising authority pursuant to 28 U.S.C. § 636(b), issued a Report and Recommendation ("R&R") on January 29, 2008, recommending that ReliaStar Life's motion for summary judgment be denied, that Mead's motion for summary judgment be granted and her claim remanded to the plan administrator.  Both parties objected to the R&R.  On March 27, 2008, the Court issued a Memorandum and Order accepting the R&R in part, modifying it in part and rejecting it in part.  The Court accepted the recommendation to deny ReliaStar's motion for summary judgment, but granted Mead's motion for summary judgment only in part, and remanded the case to the plan administrator.

Specifically, the Court was unable to determine whether ReliaStar Life's denial of LTD benefits was arbitrary and capricious, because it was unclear "whether [it] rejected the findings that Mead cannot perform full-time sedentary work, or whether, and on what basis, it concluded that Mead enjoyed a particular type of sedentary occupation that afforded her the flexibility to sit only for limited periods of time."  Mem. & Order 8, ECF No. 54.  The Court found it "impossible to tell what evidence was credited and what evidence rejected in order to arrive at the decision to deny long-term disability benefits." Id. at 10.  The Court therefore remanded the case to the plan administrator.  Id. at 15.

**F.   The Remand**

17

Following remand, Mead submitted additional medical records and vocational reports to ReliaStar Life.  They included records from Dr. Rabin, an Independent Medical Examination ("IME") by a physical medicine and rehabilitation specialist, Dr. Mark Bucksbaum, and a vocational assessment report.

Dr. Bucksbaum completed a disability evaluation for Mead on April 3, 2008.  He reviewed her medical records dating back to January 2001.  He administered a total pain impairment instrument and concluded, using the AMA Guides to the Evaluation of Permanent Impairment, 5th Edition, that Mead's score indicated moderately severe pain impairment.  Dr. Bucksbaum opined that Mead was unable to meet the essential elements of her prior employment as a strategic marketing executive.  R. at 1055.

James Parker completed a vocational assessment report for Mead on May 22, 2008.  He reviewed Dr. Bucksbaum's evaluation, including Mead's medical history, the FCE assessment, the 2004 vocational analysis and the August 2004 denial of benefits letter, in addition to Mead's statement.  Parker observed that Mead's records document that she is unable to sustain a regular eight-hour, five-day work schedule in a sedentary occupation.  He noted that a self-paced and self-scheduled exercise program had no bearing on an individual's ability to work at a sedentary occupation.  He concluded that Mead could not perform at a full-time sedentary occupation.  R. at 2878.

18

ReliaStar Life retained Vocational Directions, LLC to contact employers in the financial services industry to ascertain the physical demands of an executive in strategic marketing in 2008.  According to its report, it contacted fourteen employers. Half of them reported that a similar executive position was sedentary, that the employee could alternate sitting or standing, that air travel constituted ten percent or less of the job requirements and that accommodations were provided.  R. at 1977- 82.  Other survey responders indicated that their positions involved significant travel, or that accommodations to allow sitting and standing at will would be difficult.  *Id.*

ReliaStar Life also obtained another file review in September 2008.  Dr. Neil McPhee of Professional Disability Associates concluded that the x-ray films and MRI results would not affect Mead's ability to perform a sedentary occupation; that her exercise regimen demonstrated her ability to perform at an activity level greater than that required for a sedentary occupation, and that Mead's subjective complaints of pain were not credible.  He concluded that any particular positional intolerance could be accommodated with changes of position and an ergonomic work station.  Because Mead maintained an active program of walking, exercising, hiking and yoga, he concluded that at no time was she unable to perform the duties of a sedentary occupation for a continuous period of at least six

19

months.  R. at 1975-76.

### G.   The Remand Determination

ReliaStar Life reaffirmed its prior decision to deny Mead
LTD benefits in a letter dated September 15, 2008.  It rejected
portions of the opinions of Dr. Rabin, the FCE Evaluation, and
the vocational analysis, as inconsistent with the findings of the
WERC program notes.  It stressed that as of August 2003,
according to the WERC program notes, Mead had progressed to being
able to tolerate two hours of sitting, one hour of standing, two
to three hours of combined walking and standing[6] and three hours
of driving.  The FCE findings of October 2003 were more
consistent with Mead's original limitations, as recorded in July
2003.  ReliaStar Life concluded that the FCE Evaluation could not
be relied upon because it did not account for the inconsistency.
R. at 1951-52.

ReliaStar Life rejected the March 2004 vocational analysis
because it did not evaluate the WERC findings, failed to account
for the records reviews performed by Drs. Johnson and Yarosh, and
relied on the FCE.  R. at 1952.  It rejected Dr. Rabin's February
2004 opinion that Mead could not tolerate sitting for an hour,
given that her opinion in February 2003 was that Mead could sit

---

[6]  This finding appears to be an error.  The WERC data
collection form entries for positional tolerances as of August
21, 2003, indicated Mead was able to walk for 120 to 180 minutes.
The length of time she was able to walk and stand was not
recorded.  R. at 120.

for three to four hours.  R. at 1952.

ReliaStar Life again observed that Mead's program of exercise was inconsistent with her claim of chronic pain from cervical disc degeneration.  It concluded that it would rely upon the record reviews of Drs. Johnson and Yarosh, because they agreed that her claimed limitations were inconsistent with an individual who could engage in physical exercise and were not supported by any objective evidence in the medical records.  R. at 1954-55.

ReliaStar Life also questioned the credibility of Mead's reports of pain.  R. at 1955.

ReliaStar Life concluded that Mead "had a particular type of sedentary job which allowed her to alternate sitting and standing at will."  R. at 1951.  This conclusion was based on Mead's description of her job as flexible, with the ability to change her position and to stand up.  *Id.*  This conclusion was also based on information from an administrative assistant at ING that a vice president of brand marketing for ING would be able to alternate between sitting and standing as needed.  *Id.*

ReliaStar Life also concluded that Mead did not meet the Plan definition of Total Disability beyond twenty-four months, in that she was not disabled from performing any occupation.  R. at 1956.  It concluded further that should she be entitled to benefits, she would be entitled at best to the Plan minimum

21

benefit of $50.00 per month, because a pro-rated amount of her
lump sum payment upon termination of her employment exceeded her
basic monthly earnings.  R. at 1957-59.

**H.   The Social Security Determination**

ReliaStar obtained Mead's Social Security Administration
("SSA") disability claim file.  In December 2003, Mead submitted
a claim for SSA disability income ("SSDI") benefits claiming the
onset of her disabling condition, degenerative cervical disc
disease, on February 2, 2001.  R. at 1462.  The SSA assigned a
later onset date based on the fact that Mead had substantial
earnings in 2001 because of the lump sum payment from ReliaStar
Financial.

Mead's SSDI application was denied, on the ground that she
did not meet the SSA's definition of disability.[7]  Her request
for reconsideration was denied on the same basis.  Mead requested
a hearing before an Administrative Law Judge ("ALJ"), which
occurred on September 15, 2005.  The ALJ concluded that Mead was
not disabled within the meaning of the Social Security Act.  R.
at 1355.  Mead appealed this decision to the Appeals Council of
the SSA.  The Appeals Council vacated the decision and remanded

_____

[7]   According to SSA requirements, "[t]o be considered
disabled, a person must be unable to do any substantial gainful
work due to a medical condition which has lasted or is expected
to last for at least 12 months in a row.  The condition must be
severe enough to keep a person from working not only in her or
his usual job, but in any other substantial gainful work."  R. at
1430.

the case on July 21, 2006, to give further consideration to the treating physician's opinion, further evaluate Mead's subjective complaints of pain, consider her maximum residual functional capacity and, if warranted, obtain evidence from a vocational expert.  R. at 1403.

On November 26, 2007, the ALJ on remand concluded that although Mead had a severe impairment of degenerative disc disease with chronic pain, she was not under a disability within the meaning of the Social Security Act, because she had the residual functional capacity to perform light or sedentary work if she could alternate between sitting and standing.  R. at 1334-1340.  Mead appealed this decision, and on review the Appeals Council again vacated the hearing decision and remanded the case to further evaluate Mead's subjective complaints of pain, give further consideration to her maximum residual functional capacity, and to obtain evidence from a vocational expert to determine whether Mead has transferable skills.  R. at 1386.

On April 24, 2009, on the second remand, the ALJ again concluded that Mead was not under a disability as defined by the Social Security Act, because she retained residual functional capacity.  R. at 1371-80.  Mead's appeal of the second remand decision had not been resolved as of the completion of the briefing on the parties' cross-motions for summary judgment.

I.   **Appeal of the Remand Determination**

Mead appealed ReliaStar Life's adverse decision on March 10, 2009.  On April 30, 2009, Mead attended an IME at the appeal committee's request with Dr. George White, Jr.  Dr. White was asked to evaluate Mead's condition during the benefit waiting period from January 28, 2003 through July 29, 2003.  He did not see how her symptoms would prevent her from performing a sedentary occupation.  R. at 580.

Mead attended another IME with Dr. Kevin Sheth, a neurologist, on May 26, 2009, again at the appeal committee's request.  Dr. Sheth concluded that Mead's pain symptoms were supported by the imaging findings and were typical for patients with severe degenerative disc disease.  Periods of prolonged sitting would exacerbate the disease and the pain symptoms.  He concluded based on his record review that in 2003 Mead would have been restricted to performing sedentary tasks for limited periods in the 30 to 60 minute range, with opportunities to take 30 to 60 minute breaks.  R. at 1320-21.

When pressed by ReliaStar Life's appeals case manager, Dr. Sheth was "optimistic" that if Mead were provided with work site accommodations such as a sit-stand workstation, a telephone headset, and the ability to take breaks, she could work a full-time sedentary job.  R. at 3234.

On September 30, 2009, the ReliaStar Life appeal committee

affirmed the September 2008 adverse determination.  It summarized
the history of the claim, and stated that the issue before the
committee was to determine if Mead met the definition of "Total
Disability" throughout and beyond the twenty-six week benefit
waiting period that ran from January 28, 2003 through July 29,
2003.  If she met the definition of total disability from her own
occupation, then the committee was to determine if she remained
totally disabled from performing any occupation beginning July
29, 2005.  It summarized the records it reviewed, and stated that
it would give no deference to the prior decisions made by the
claim department or the appeal committee.  R. at 2919.

The appeal committee first addressed the date of disability.
It noted that Mead asserted a disability date of January 28,
2003, the date on which she submitted her claim.  It noted that
her social security disability claim was based on a disability
date of February 2, 2001.  It discussed Mead's reports that she
had suffered from this condition for years, and the pain had been
severe prior to 2003.  It observed that there was no documented
change in her condition as of January 28, 2003, and concluded
that it could not establish a date of disability.

Next, the appeal committee addressed the reports of Mead's
"functionality."  It rejected Dr. Rabin's assessments as
inconsistent and not based on objective testing.  The appeal
committee found the most reliable assessment of Mead's

25

functionality to be the results of the three-week WERC work hardening program, which was completed shortly after the conclusion of her benefit waiting period.  R. at 2922.  The appeal committee rejected the followup FCE at WERC as unreliable, however, because it failed to discuss the progress Mead had made two months earlier in the work hardening program.  R. at 2923.

The appeal committee rejected Dr. Bucksbaum's report because he failed to consider the WERC program results, miscalculated his pain assessment, did not indicate the period of time for which he was evaluating Mead, and his examination occurred five years after Mead's claimed date of disability.  R. at 2923-24.  It found that its own IME reports were not reliable because they occurred six years after Mead's claimed date of disability, even though the physicians were instructed to evaluate Mead's pain and functional impairment during the period January 28 through July 29, 2003.  R. at 2925.  The appeal committee also rejected Mead's vocational assessments from 2004 and 2008-09.  R. at 2925-28.

The appeal committee concluded that the record reviews requested by ReliaStar Life from 2003, 2004 and 2008 were a reliable representation of Mead's condition as of January 28, 2003, because their opinions were based solely on the "medical records during the relevant time period."  R. at 2925.  It also concluded that the "labor market survey" performed in 2008 was an accurate comparison of Mead's job in 2000.  R. at 2926.  It found

it "reasonable to believe that Ms. Mead would have been afforded accommodations such as a sit/stand workstation, an ergonomic chair and telephone headset that would allow her to sit and stand at will." R. at 2928.

The appeal committee also deemed documents from Mead's Social Security disability claim file to be a reliable source of information. R. at 2929.

The appeal committee then analyzed and rejected various dates of disability it believed that Mead had provided. R. at 2929-30. With regard to the only date Mead claimed in her request for LTD benefits from ReliaStar Life, the appeal committee concluded that she was "not impaired from performing the essential duties of her own occupation due to limited cervical range of motion, upper extremity weakness or numbness, cognitive impairments or restrictions in her ability to handle or finger objects." R. at 2930.

Finally, the appeal committee addressed Mead's claim of severe neck and upper back pain. It found that her "self-reports of the severity of her pain are not supported by the evidence as she takes little if no medication for pain or inflammation and is able to perform a wide range of activities of daily living, many household chores and recreational and exercise activities . . . that require a much higher level of exertion to perform than is required by her own occupation." *Id.* It noted that none of her

treating or examining physicians had recorded any observed pain behavior at appointments.

Ultimately, the appeal committee decided that Mead

> was not Totally Disabled throughout and beyond the
> benefit waiting period that ran from 1/28/03 through
> 7/29/03.  The results of the WERC Work Hardening
> Program that Ms. Mead completed shortly after the
> benefit waiting period ended show that she was able to
> return to all activities of daily living, had a
> reduction in her symptoms and reported that she was
> able to sit for 120 minutes at a time, walk and stand
> for 120 to 180 minutes at a time[8] and drive for 180
> minutes at a time.  Given these functional capacities,
> she would have been able to perform the essential
> duties of her occupation as a M/C V
> Communications/Community Relations executive as it is
> performed in the national economy with reasonable
> accommodations of changing positions as needed and
> considering ergonomic enhancements to her worksite area
> throughout the benefit waiting period of 1/28/03
> through 7/29/03.

R. at 2931.

Following this negative determination, Mead again seeks review in this Court.

## II.  Standard of Review and Applicable Law

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  In determining whether a genuine issue

---

[8] This finding perpetuates the error from the September 15, 2008 denial letter.  Mead's walk and stand tolerances were not recorded in the WERC hardening program notes.  R. at 120.

of material fact exists on cross-motions for summary judgment, the Court must resolve all ambiguities, and draw all inferences, against the party whose motion is under consideration. *See, e.g.*, *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 283-84 (2d Cir. 2005). "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 137 (2d Cir. 2010) (quotation marks and citation omitted).

ERISA's Section 502(a)(1)(B) permits a plan participant to bring a civil action to recover benefits due to her under the terms of her plan, to enforce her rights under the terms of the plan, or to clarify her rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). The standard of review for a § 1132(a)(1)(B) action is de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where a benefit plan confers discretionary authority on the plan administrator, a reviewing court's role is limited to determining whether the administrator abused its discretion, *id.* at 111, by subjecting the plan administrator's decisions to arbitrary-and-capricious review. *Durakovic*, 609 F.3d at 137. Under this deferential standard, "a court may not overturn the

administrator's denial of benefits unless its actions are . . . 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic*, 609 F.3d at 141.

"If 'a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.'" *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone*, 489 U.S. at 115. "[A]n ERISA-fund administrator that 'both evaluates claims for benefits and pays benefits claims' is conflicted, and . . . a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis." *Durakovic*, 609 F.3d at 138 (quoting *Glenn*, 554 U.S. at 111-15).

## III. Discussion

### A. Standard and Scope of Review for the Denial of Mead's Claim

Because ReliaStar Life retains "final discretionary authority to determine all questions of eligibility and status

30

and to interpret and construe the terms of" the Plan, R. at 25,
its denial of Mead's claim is subject to arbitrary-and-capricious
review.  *See Firestone*, 489 U.S. at 115; *Durakovic*, 609 F.3d at
137 & n.2.  The parties agree that ReliaStar Life operates under
a conflict of interest because it both evaluates claims for
benefits and pays benefits claims.  *See Glenn*, 554 U.S. at 112.
Therefore this Court must "take account of the conflict when
determining whether the [administrator], substantively or
procedurally, has abused [its] discretion."  *Id.*

    "The weight properly accorded a *Glenn* conflict varies in
direct proportion to the 'likelihood that [the conflict] affected
the benefits decision.'"  *Durakovic*, 609 F.3d at 139 (quoting
*Glenn*, 554 U.S. at 117).  "Evidence that a conflict affected a
decision may be categorical (such as a history of biased claims
administration) or case specific (such as an administrator's
deceptive or unreasonable conduct)."  *Id.* at 140 (quotation marks
and citation omitted).  "[I]n the absence of any evidence that
the conflict actually affected the administrator's decision,"
however, a conflict of interest receives no weight.  *Id.*

    Mead argues that ReliaStar Life's determination was not the
result of a deliberate and principled reasoning process; that it
imposed a standard not required by the plan's provisions; that it
favored file review physicians over all examining physicians; and
that it has a history of changing occupational definitions when

31

adjudicating disability claims, all of which signify that
ReliaStar Life's conflict of interest must be taken into account
when evaluating whether it has abused its discretion.

With the exception of Mead's claim that ReliaStar Life has a
history of changing occupational definitions, the evidence
concerning the weight to be accorded to ReliaStar Life's conflict
of interest is specific to Mead's case, and is part of the
administrative record.  Mead's evidence of a history of changing
occupational definitions consists a citation to an unpublished
decision from the Southern District of Indiana, which denied
summary judgment to ReliaStar Life on a bad faith insurance
claim.  *See Sieveking v. Reliastar Life Ins. Co.*, No. 4:08-cv-
0045-DFH-WGH, 2009 WL 1795090 (S.D. Ind. June 23, 2009).  It is
not clear from the decision whether ReliaStar Life made the
concededly unreasonable interpretation of the plan, as it was not
the administrator of the plan it issued.  *See id.* at *1.
Assuming however that ReliaStar Life was responsible, one
instance of unreasonable plan interpretation, combined with the
circumstances of this case, does not constitute a history.  Based
on the evidence provided, the Court is not able to find that
ReliaStar Life has a history of changing occupational
definitions, or of any other sort of biased claims
administration.

With respect to the remainder of Mead's evidence that

32

ReliaStar Life's conflict of interest should carry significant
weight in the abuse of discretion analysis, the Court turns first
to the evidence that ReliaStar Life abused its discretion.  If
ReliaStar Life's decision cannot withstand arbitrary-and-
capricious review, then there will be no need to determine the
weight to accord any evidence that ReliaStar Life's conflict of
interest affected its decision to deny Mead LTD benefits.

Because ReliaStar Life's appeal committee stated in its most
recent denial that it evaluated Mead's claim based on a fresh
look at the entire claim file, without deference to any previous
denials, the Court reviews the September 2009 decision for abuse
of discretion.

### B.    The Physical Requirements of Mead's Own Occupation

The job description provided by ReliaStar Financial listed
the essential functions of her job, but did not include any
details of the physical requirements of her job.  The parties
have agreed that her occupation is essentially sedentary.  As the
Court observed in its March 27, 2008 Memorandum and Order,
however, it was impossible to tell from the record how the plan
administrator determined that Mead was capable of performing her
sedentary job, given that it provided no definition of sedentary,
and no evidence that she could perform her job by alternating
sitting and standing at will.  Mem. & Order 6-7.

Although the size of the administrative record has

33

approximately tripled since the Court's remand, ReliaStar Life
has yet to accept Mead's evidence of the physical requirements of
her job, or to provide evidence that the physical requirements of
her job differed from her description.  ReliaStar Life disputes
that Mead's job with ReliaStar Financial required overnight air
travel involving one to two trips per month and flights of three
to four hours' duration, active participation in meetings for as
many as eight hours in a longer work day, and constant use of a
computer.  Def.'s Response to Pl.'s Statement of Undisputed Facts
4-5, ECF No. 94.  It does not, however, appear to dispute the
fact that Mead's job with ReliaStar Financial involved such
activity, but instead contends that the policy defines "Total
Disability" in terms of Mead's occupation in general, not the
duties of her particular job.  *Id.* at 5.

"Own occupation" is not defined in the Plan.  Other courts
have routinely accepted that "own occupation" means the
claimant's own job with her employer.  *See, e.g.*, *Byars v. Coca-
Cola Co.*, 517 F.3d 1256, 1265 n.8 (11th Cir. 2008) (equating "own
occupation" with "own job" in a plan administered by ReliaStar
Life); *Kao v. Aetna Life Ins. Co.*, 647 F. Supp.2d 397, 415 (D.
N.J. 2009) (discussing claimant's "own occupation" as "her usual
work as it is an intellectually demanding job . . ."); *Newman v.
ReliaStar Life Ins. Co.*, No. 1:04-CV-2391, 2005 WL 1521399 at *2,
7 (M.D. Pa. June 27, 2005) (evaluating ReliaStar Life's denial of

LTD benefits with respect to claimant's past job under an identical definition of "Total Disability"); *Madaffari v. Metrocall Cos. Grp. Policy GL, H-21163-0, Plan No. 501*, No. 02 C 4201, 2005 WL 1458071, at *2, 10 (N.D. Ill. June 15, 2005) (discussing physical requirements of sales manager position with respect to claimant's job, under a similar definition of "Total Disability").

Similarly, the Second Circuit has made clear in discussing the similar term "regular occupation" that although the term means "'a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties,'" that definition "requires consideration of what sort of position is 'of the same general character.'" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252-53 (2d Cir. 1999) (quoting *Dawes v. First Unum Life Ins. Co.*, 851 F. Supp. 118, 122 (S.D.N.Y. 1994)). In *Kinstler*, a director of nursing's regular occupation was defined as "a director of nursing at a small health care agency, as distinguished from a large general purpose hospital." *Id.* at 253. The material duties of Kinstler's job, and therefore its physical demands, differed from the general job description for a director of nursing; it was appropriate to consider the requirements of the particular type of institution for which she worked. *Id.*

To be sure, ReliaStar Life retains the discretion to interpret the terms of the plan.  R. at 25.  But its apparent interpretation of "own occupation" is absent from the appeal committee's 34-page decision denying Mead's claim, and indeed from the administrative record as a whole.  The appeal committee deemed that its task of determining whether Mead was totally disabled from her own occupation during the relevant time period required it to evaluate whether she was capable of performing her occupation as a M/C V Communications/Community Relations executive, the job she performed for ReliaStar Financial.  R. at 2901, 2924-25, 2926, 2931.

Ultimately, however, whether ReliaStar Life considered narrowly whether Mead was capable of performing the essential duties of her job at ReliaStar Financial or more broadly whether she was capable of performing the essential duties of a position of the same general character, it was necessary to ascertain what the physical demands of those essential duties were.  *See Kinstler*, 181 F.3d at 253; *see also Peck v. Aetna Life Ins. Co.*, 495 F. Supp. 2d 271, 277 (D. Conn. 2007) (rejecting as arbitrary and capricious a plan administrator's definition of "own occupation" that was unmoored from any consideration of the character of the claimant's actual duties).  This is the issue the Court sought to have addressed on remand:  what were the physical requirements of Mead's job; whether the plan

36

administrator rejected the findings that Mead cannot perform full-time sedentary work; whether and/or how it concluded that Mead could do her job if she could only sit for limited periods of time.  *See* Mem. & Order 8.

Mead detailed the physical requirements of her job, as the appeal committee acknowledged:  "'her position required extensive travel, one to two times a month two to three days at a time. She was required to travel by airplane all over the country, spending three to four hours on a plane at one time.  She confirms that she was able to change her position and could stand up for brief periods during the course of her day.'"  R. at 2902 (quoting a March 29, 2004 letter from Mead's attorney).  The March 29, 2004 letter also stated that the position required management and oversight of approximately eighty professionals who reported to her in various locations around the country. . . . The majority of each day was spent seated in structured meetings (estimated at eight hours of meeting time per day)."  R. at 202-03.  ReliaStar Life has not disputed the accuracy of this description, including the fact that Mead, like many executives, worked longer than eight hours a day.

Instead ReliaStar Life commissioned a nationwide Labor Market Survey to ascertain whether the occupation of executive in strategic marketing in 2008 1) is considered to be a sedentary occupation, defined as up to two hours of standing or walking and

six hours of sitting in an eight-hour work day; 2) affords the opportunity to sit or stand at will; 3) would allow alternating between sitting and standing at will as a reasonable accommodation; and 4) requires infrequent travel.  The contractor surveyed fourteen companies.  Seven employers responded that such positions existed at their companies.  Others responded that a vice president of marketing in the financial services industry spent up to fifty percent of her time in travel, or that it would be difficult to alternate postures as needed for comfort.  R. at 1978-1982.

From this inquiry the appeal committee concluded that the survey was an accurate comparison of Mead's occupation as it is currently performed in the national economy, and that the survey's seven positions were appropriate surrogates.  R. at 2926.  ReliaStar Life ignored utterly the requirement that a comparable position be of the same general character as Mead's position.  *See Kinstler*, 181 F.3d at 252-53.  It ignored the survey responses that indicated that such a position required extensive travel or that an employee would find it difficult to perform her job if she could not sit for extended periods.  The conclusion that seven marketing positions in the national economy involving ten percent or less of travel were comparable to Mead's position, when the undisputed evidence was that Mead traveled up to thirty percent of her time between locations in New York,

Minnesota and Washington, was without reason and unsupported by the evidence; in other words, it was arbitrary and capricious. *See, e.g., Zurndorfer v. Unum Life Ins. Co. of Am.*, 543 F. Supp. 2d 242, 262-63 (S.D.N.Y. 2008) (finding that disregarding travel requirements of claimant's job was arbitrary and capricious); *Shore v. PaineWebber Long Term Disability Plan*, No. 04-CV-4152(KMK), 2007 WL 3047113, at *12-13 (S.D.N.Y. Oct. 15, 2007) (finding that ignoring the actual duties of claimant's job and the institution where she was employed was arbitrary and capricious).

The record evidence is undisputed that the general character of Mead's occupation was essentially sedentary, allowed some flexibility to alternate her position between standing and sitting, involved up to 30% of her time in travel by air, and up to eight hours in structured meetings. The issue before the appeal committee thus was whether Mead met the definition of Total Disability from this occupation throughout and beyond the period from January 28, 2003 through July 29, 2003.

### C.   Reasonable Accommodation

The appeal committee concluded that Mead "would have been able to perform the essential duties of her occupation . . . with reasonable accommodations of changing positions as needed and considering ergonomic enhancements to her worksite area." R. at 2931. Mead argues that ReliaStar Life impermissibly read an

39

accommodation provision into her plan.

The plan makes no mention of accommodation in its definition of "Total Disability."  For Mead to be totally disabled under the terms of her plan she must be "unable to do the essential duties of [her] own occupation, due to sickness or accidental injury." R. at 23.  Mead's own occupation, however, as discussed in the previous section, embraces not only her particular job, but a job of the same general character, with comparable duties.  *See Kinstler*, 181 F.3d at 252.  A job that afforded accommodation, to enable Mead to perform the essential duties of her occupation, would be a job of the same general character as Mead's original position.  Therefore it was not unreasonable for the appeal committee to attempt to determine whether Mead could perform the essential duties of her own occupation with reasonable accommodation.

Unaccountably, however, the appeal committee overlooked any accommodation that would enable Mead to maintain her demanding travel schedule, yet it did not reject the contention that regular travel to the company's subsidiaries was an essential duty of her job.  Further, the appeal committee concluded that an ergonomic work station and alternating between sitting and standing as needed throughout the day was a reasonable accommodation, although the only evidence it cited that these accommodations would enable Mead to perform her job was her

40

statement that she could change position and stand up for brief periods during the course of her day.  R. at 2902, 2931. Shifting position and standing up for brief periods is not comparable to performing one's work while alternating between sitting and standing throughout the course of a day.

Thus, the determination that Mead could perform the essential duties of her occupation with reasonable accommodation was arbitrary and capricious, not because ReliaStar Life was barred from considering reasonable accommodations, but because it failed to provide substantial evidence that the accommodations it considered would have sufficed to enable Mead to perform her job, given the essential duties of her occupation.

D.   **The Appeal Committee's Assessment of Mead's Pain**

The appeal committee discredited Mead's assessments of her pain, "as she takes little if no medication for pain or inflammation and is able to perform a wide range of activities of daily living, many household chores and recreational and exercise activities . . . that require a much higher level of exertion to perform than is required by her own occupation."  R. at 2930. The appeal committee noted that Mead reported being able to knit and crochet and concluded:

> If she is able to perform these sedentary activities
> that require static neck positioning, it is reasonable
> to conclude that she is able to perform the essential
> duties of her occupation as a M/C V
> Communications/Community Relations executive given
> appropriate worksite accommodations such as a sit/stand

workstation, ergonomic chair and telephone headset with
the ability to sit and stand at will.

R. at 2931.  Finally, the appeal committee noted that none of the
physicians who had seen Mead had documented any "pain behaviors,"
such as grimacing or shifting her position.  *Id.*

"'[T]he subjective element of pain is an important factor to
be considered in determining disability.'"  *Connors v. Conn. Gen.
Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (quoting *Mimms v.
Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)).  A plan administrator
does not necessarily abuse its discretion if it requires
objective support in addition to subjective reports of pain,
however.  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 88 (2d
Cir. 2009).  But a determination that pain complaints lack
credibility must have some evidentiary basis in the record.  *See
Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 100 (2d Cir. 2003).  The
appeal committee cited the evidence that Mead takes little or no
pain medication, is active, can knit and crochet, and has not
demonstrated to her doctors overt signs that she is in pain.  The
problem with this evidence is that it doesn't challenge the
conclusion that Mead experiences severe pain when performing the
functions of a full-time sedentary job.  Her level of physical
activity has little to do with the essential duties of a
sedentary occupation.  There is evidence that Mead did not
receive enough benefit from a variety of medications to be
willing to cope with their side effects.  Winces and grimaces may

not be an individual's preferred method of communicating to her
doctors that she is in pain.  The record certainly reflects that
she communicated in words that she suffered from pain.  And
unless there is some evidence that knitting and crocheting occupy
several hours of Mead's days several days a week, the fact that
she was able to undertake these activities does not supply
evidence that her complaints of severe pain from full-time
sedentary work lack credibility.

     The appeal committee rejected any evidence that supported
Mead's complaints of pain.  It discredited the pain evaluation
administered by Dr. Bucksbaum, based on its determination that he
had miscalculated her score, and also because he apparently
reviewed her condition in 2008 rather than 2003.  It discredited
Dr. Rabin's assessment of pain because Dr. Rabin gave
inconsistent estimations of Mead's ability to function.  It
refused to consider Dr. Ames's assessment of pain because it was
not tied to an opinion as to whether Mead could work.  It ignored
the fact that Dr. Borrello, a pain management specialist, treated
her for several months in 2003.

     The appeal committee denigrated its own neurologist's pain
assessment because Dr. Sheth had been retained by ReliaStar Life
in 2009, and therefore had not observed her in 2003.  ReliaStar
Life, however, specifically asked Dr. Sheth to review Mead's
records from January through July of 2003 and to determine

whether Mead's level of activity was consistent with her reported

level of pain and functional impairment.  He responded:

> Her level of activity did seem consistent [sic] her
> reported level of pain.  The important thing to
> remember is that her symptoms and level of activity
> were dynamic which can often be the case in similar
> scenarios.  Sitting or lying in certain positions for
> an extended period of time may exacerbate symptoms.
> Patients may need to change or avoid those positions.
> In the absence of such exacerbations, their level of
> activity may be quite full.  Her complaints were
> consistent as documented by multiple health care
> providers over this time period.

R. at 1320.

Thus any physicians who observed Mead recently were not

deemed to have reliable opinions on her complaints of pain, and

the physicians who observed Mead in 2003 were ignored because

their assessments of pain were not tied to a reliable estimate of

functionality (Dr. Rabin), or were not tied to any estimate of

functionality (Dr. Ames and Dr. Borrello).

The appeal committee deemed Dr. Ames "the specialty

physician most knowledgeable concerning Ms. Mead's neck and upper

back pain." R. at 2922.  Dr. Ames diagnosed Mead with discogenic

pain, that is pain resulting from degenerative disc disease.  She

discussed various options for treatment of the pain, including

whether to undergo a selective nerve root block or discogram in

order to determine the exact disc or discs causing the pain.  R.

at 670.  Dr. Borrello's diagnosis was the same:  cervical

degenerative disc disease.  He opined that "[h]er widespread

degenerative changes may be likely responsible for her intrascapular pain and pain along the leading edge of the trapezius." R. at 652. In February 2003 he administered a cervical epidural steroid injection. R. at 651. In March 2003 he prescribed muscle relaxants. R. at 656. In April 2003 he performed a medial branch block at three levels of her cervical spine. R. at 661. In May 2003 he administered a selective nerve root injection of a corticosteroid. R. at 665. All of these procedures were undertaken in an effort to relieve Mead's pain.

The appeal committee may have acted within its discretion to discount Dr. Rabin's assessment of Mead's pain based on its criticism of the inconsistencies in Dr. Rabin's assessment of Mead's functional capacity. It had no reason whatsoever to ignore Dr. Ames's diagnosis, and Dr. Borrello's treatments, which supplied objective evidence to support Mead's subjective complaints of pain. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *accord Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006).

The administrative record reflects that there was ample objective confirmation of Mead's pain, including from the physician deemed most knowledgeable about her pain. The record

45

also reflects that the appeal committee's rejection of Mead's
severe neck and upper back pain as unsupported by the evidence,
is itself unsupported by the evidence.  Accordingly, the Court
finds that the plan administrator's rejection of Mead's severe
cervical pain was arbitrary and capricious.

### E.    The Appeal Committee's Assessment of Mead's Functionality

The appeal committee rejected Mead's physicians' opinions
concerning her ability to perform her job.  Dr. Rabin's
assessments were "inconsistent," and not based on independent
testing.  R. at 2921.[9]  Dr. Bucksbaum's independent testing in
2008 was deemed irrelevant and not adequately tied to her
condition during the benefit waiting period.  The appeal
committee also rejected the opinions of the occupational
therapist who performed a functional capacity evaluation as
"unreliable," R. at 2923, and two vocational experts as
"unsupported."  R. at 2925.

ReliaStar Life obtained an IME from neurologist Kevin Sheth
in 2009 who examined Mead and reviewed her medical records.  When
asked "was Ms. Mead capable of performing the essential duties of
her sedentary occupation as a Communications/Community Relations
executive on a full-time sustained basis from 1/28/03 throughout
and beyond 7/29/03?" Dr. Sheth responded:

---

[9]  Dr. Borrello and Dr. Ames were not asked to provide their
opinions concerning Mead's ability to perform her job.

Ms. Mead has degenerative disc disease in her cervical
spine.  Her symptoms are at least in part related to
this disease.  It is reasonable to believe that she
would experience symptoms of back pain and spasm, after
periods of sitting for prolonged periods of time, that
would not allow her to function at her job.  How long
would be too long?  How much discomfort should be
tolerable?  Are there other ways besides sitting at a
desk that she could accomplish the essential tasks?
There are no clear black and white answers to these
questions.  It is very reasonable for Ms. Mead to
complain of the symptoms of back pain and right arm
pain after periods of prolonged sitting.  It is
probably not reasonable to expect someone to continue
to work in a position which leads to progressive
episodes of pain and discomfort.

R. at 1321.  According to Dr. Sheth, Mead would have been

restricted to performing sedentary tasks for thirty to sixty

minutes, followed by breaks of thirty to sixty minutes to stand

or walk.  R. at 1321.  After the ReliaStar Life appeals case

manager talked to Dr. Sheth about his report and queried whether

Mead could return to full-time work, he responded that he was

"optimistic" that she could do so with appropriate

accommodations.  R. at 3234.  The appeal committee however

attached less weight to Dr. Sheth's opinion because his exam took

place six years after the claimed date of disability.  R. at

2925.

Instead the appeal committee credited the record reviews of

Dr. Johnson, Dr. Yarosh, Dr. Nudelman and Dr. McPhee, because

"their opinions were based solely on the information contained in

Ms. Mead's medical records during the relevant time period."  R.

at 2925.  This statement mischaracterizes the doctors' opinions.

47

Dr. Johnson based his opinion largely on his misrepresentation of a telephone conversation with Mead's treating physician, and he did not have the benefit of the data from the work hardening program Mead attended in the summer of 2003. Dr. Yarosh did not review Mead's entire medical file. Dr. Nudelman simply presented the views of his anonymous consultants. In 2008 Dr. McPhee reviewed Mead's entire claim file, not just the medical records from 2003, just as Dr. Sheth did in 2009. The appeal committee neglected to explain the basis for finding Dr. Sheth's record review unreliable, stating only that Dr. Sheth's examination of Mead took place six years after her claimed date of disability.

It is certainly true that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Hobson, 574 F.3d at 85 (quoting *Black & Decker*, 538 U.S. at 834). In this case however the appeal committee gave obviously false or misleading reasons to discredit the record review of its neurologist and to justify its reliance on its non-examining file reviewers. This is a paradigm of arbitrary and capricious decisionmaking.

The appeal committee also found that the most reliable and credible assessment of Mead's functionality was the information

48

in the records from the WERC work hardening program Mead attended

in 2003.  The appeal committee selectively quoted from the WERC

notes from August 22, 2003 and September 29, 2003 in its denial

letter.  It did not indicate in any way that the full record was

less credible or reliable than the excerpts it emphasized.[10]

The occupational therapy data collection form included a

"positional tolerance" section, in which Mead reported her

ability to sit, stand, walk and drive on July 1, before she began

the work hardening program, and on August 21, at the end of the

program.  Mead reported that her ability to sit increased from 30

minutes to 120 minutes; her ability to stand increased from 30

minutes to 60 minutes; her ability to walk increased from 60

minutes to 120-180 minutes; and her ability to drive increased

from 15 minutes to 180 minutes.[11]  R. at 683.  In relying on this

---

[10]   The WERC records include cervical spine examinations
dated June 18, August 5, August 14, August 21 and September 29,
2003; occupational therapy data collected on July 1 and August
21, 2003; a self-evaluation of the patient's ability to perform
activities at home dated July 1, 2003; an occupational therapy
evaluation dated July 22, 2003 from a July 1 examination; a
psychological evaluation dated July 3, 2003; a psychology
progress note dated July 11, 2003; a work hardening program
progress note dated August 15, 2003; an end of work hardening
program note dated August 22, 2003; an outpatient counseling
progress note dated September 15, 2003; and a one-month follow-up
discharge note dated September 29, 2003.  R. at 679-80, 683-93,
695-708, 711-14.

[11]   That the appeal committee's September 2009 letter
continued to misstate the physical tolerance information that was
first misstated in ReliaStar Life's September 2008 letter,
suggests that the appeal committee's "independent assessment of
the evidence" did not extend to the original records from the

self-reported data, the appeal committee did not in this instance challenge Mead's credibility.  The reported tolerances are consistent with the WERC program occupational and physical therapists' observations.

After a three-week intensive program of physical conditioning, the occupational therapist evaluated Mead's progress toward reaching a short-term goal of returning to work. As to her ability to sit for five to six hours intermittently, work at a computer for two hours at a time, or drive for four hours, he concluded that she had partially met her goal.  R. at 707.  As to her long-term goal of returning to work within three to six weeks, he concluded that the goal was "NA" (presumably not applicable).  *Id.*  At Mead's one-month follow-up, the occupational therapist concluded that her ability to reach the functional tolerances of sitting for five to six hours intermittently, working at the computer for two hours at one time, and driving for four hours had not been met, and that her goal of returning to work within three to six weeks was as a consequence only partially met.  R. at 713.

The physical therapist, discussing Mead's application for disability, opined that Mead "has not embraced the concept of finding work outside of the consulting field that is non-

--------

WERC program, but to a subsequent selective summary of the records.  *Compare* R. at 683, 1951, 2922.

sedentary.  [She] may have a hard time entering the workforce again if she is not able to see herself working in a non-sedentary occupation." *Id.* at 713-14.  All in all, the WERC records reflect that participation in the program enabled Mead to increase her strength, endurance and mobility, and to manage her symptoms.  Far from supporting the notion that Mead was therefore able to function in a full-time sedentary job, the data, supported by the therapists' observations, indicate unequivocally to the contrary.  Both therapists noted that participation in the program enabled Mead to return to activities of daily living and recreation, including gardening, cooking, housework, driving and exercise.  The occupational therapist concluded however that Mead could not yet perform a full-time sedentary job, even if she sat "intermittently."[12]  The physical therapist concluded that Mead should seek non-sedentary work if she wished to work.

Mead achieved good results from her participation in the WERC program; her physical abilities had reportedly deteriorated by the end of October when the WERC FCE was performed.  The appeal committee rejected the WERC FCE because it didn't reference the earlier-recorded positional tolerance data, or

---

[12]  Although ReliaStar Life found seven employers in the country who employed financial services executives whose jobs were considered sedentary, who rarely traveled and could sit and stand at will, its Labor Market survey did not inquire whether those executives were also permitted the accommodation of working part-time, or reducing their hours at will.

explain the apparent discrepancy between the results achieved
during the intensive physical training program and the reduced
tolerances she could achieve two months after the program ended.
ReliaStar Life's clinical case manager found the FCE reliable,
however.

Even if the rejection of the FCE results withstands
arbitrary-and-capricious review, the appeal committee offered no
reasonable basis for its selective and inaccurate summary of the
WERC evidence.  Taken in its entirety, the evidence from the WERC
program showed that Mead could not work full-time at her
sedentary occupation before, during and after the beginning of
July 2003 through the end of September 2003.  This selective if
not distorted treatment of the file reviews and the WERC program
evidence not only undermines the rationality of the appeal
committee's determination; it lends support to the argument that
ReliaStar Life's structural conflict of interest should weigh
more heavily in the Court's arbitrary-and-capricious review.  *See*
*Glenn*, 554 U.S. at 118 (noting factors that justify giving more
weight to a conflict of interest include emphasizing one medical
report while de-emphasizing other reports, and failure to provide
independent experts with all of the relevant evidence).

## F.    The Appeal Committee's Use of Mead's Social Security Disability Records

The appeal committee found documents submitted to the SSA
in connection with Mead's disability claim to be a reliable

source of information.  R. at 2929.  It characterized the SSA

findings as having "arrived at essentially the same conclusion as

the Committee that Ms. Mead is capable of performing her past

work as a M/C V Communications/Community Relations executive with

the opportunity to alternate postures between sitting and

standing and to avoid forward flexion and static position of the

neck." *Id.*

The SSA Appeals Council has twice vacated the ALJ's decision

for failure to evaluate adequately Mead's complaints of pain, and

the third unfavorable decision remains on appeal.  Setting aside

these facts, the ALJ's April 24, 2009, decision concluded that

Mead "had the residual functional capacity to perform light work

as defined in 20 CFR 404.1567(b) except the claimant requires the

opportunity to alternate postures between sitting and standing

and to avoid forward flexion and static position of the neck."

R. at 1377.  20 C.F.R. § 404.1567(b) defines light work as

> involv[ing] lifting no more than 20 pounds at a time
> with frequent lifting or carrying of objects weighing
> up to 10 pounds.  Even though the weight lifted may be
> very little, a job is in this category when it requires
> a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling
> of arm or leg controls. . . . If someone can do light
> work, we determine that he or she can also do sedentary
> work, unless there are additional limiting factors such
> as loss of fine dexterity or **inability to sit for long
> periods of time.**

20 C.F.R. § 404.1567(b) (emphasis supplied).

The ALJ then concluded that Mead "was capable of performing

past relevant work as a vice-president of a financial institution." R. at 1379. "Past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity," 20 C.F.R. § 404.1560(b)(1), taking into consideration not only the physical and mental demands of a claimant's own work but also as it is generally performed in the national economy. *See id*. § 404.1560(b)(2).

The appeal committee conflated these two conclusions to reach an inaccurate summary of the SSA evaluation as "essentially the same" as that of the committee. First, the inquiry in Social Security benefits cases is not merely whether a claimant is able to perform the duties of her previous job, but whether the claimant is able to perform the duties associated with her work as it is generally performed in the national economy. *See id*.; *accord Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). As discussed previously, the inquiry in an "own occupation" disability benefits determination is narrower: whether the claimant is able to perform the duties of her previous job, taking into consideration the requirements of the particular type of institution for which she worked. *See Kinstler*, 181 F.3d at 252.

Second, although the ALJ found that Mead's degenerative disc disease could reasonably be expected to produce pain, she did not credit Mead's allegation that she could not sit for more than a

couple of hours per day even with the opportunity to alternate postures.  R. at 1378.  The ALJ supported this lack of credibility finding with a discussion of Mead's activities, none of which involved sitting for any period of time.  *Id.*  The ALJ also attached significant weight to the opinions of Dr. Conley and Dr. Axline.  R. at 1379.  Dr. Conley reviewed Mead's medical records, but did not perform any observations or administer any tests.  She concluded, without stating the basis for the conclusion, that Mead could sit with normal breaks for about six hours in an eight-hour work day.  She also found that Mead's symptom allegations lacked credibility because her level of physical activity was inconsistent with someone who experienced pain while sitting or standing.  R. at 735, 740.  Dr. Axline, an orthopedic specialist, testified at the hearing that Mead could do light work, in keeping with her physical activities.  R. at 1004.

The ALJ's conclusion that Mead could perform light work is irrelevant to the issue of whether she could perform sedentary work that required prolonged sitting.  The ALJ's conclusion that Mead's claim of inability to tolerate prolonged sitting lacked credibility is not supported by the evidence the ALJ cited.  The ALJ's conclusion that Mead could tolerate sedentary work if she could alternate between sitting and standing and avoid forward flexion and static position of the neck does not assist the

appeal committee in determining whether Mead's own occupation permitted this flexibility.  Accordingly, the appeal committee's reliance on the SSA evaluation to bolster its conclusion that Mead was not totally disabled from her own occupation was arbitrary and capricious.

### G.   Failure to Consider Whether Mead was Residually Disabled Under the Plan

Mead argues that ReliaStar Life should have considered whether she could have qualified as "residually disabled" under the terms of the plan.  Under the plan, a claimant is residually disabled when:

> [y]our indexed Basic Monthly Earnings are reduced by more than 20% because of sickness or accidental injury[; y]ou are unable to perform all of the essential duties of your regular occupation on a full-time basis[; y]ou are performing at least one of the essential duties of your own occupation or another occupation on a part-time or full-time basis."

R. at 23.

Mead has not sought a determination that she was residually disabled; she has sought a determination that she was totally disabled.  In the nearly eight years that her claim has been pending, Mead's claim, her appeals and her complaint have focused on obtaining a total disability determination.  Although the record reflects that in September 2003 Mead volunteered at a local art gallery for four hours per week for an unspecified period of time, R. at 136, at no time did she provide any details that would enable the plan administrator to determine whether

56

Mead was performing at least one of the essential duties of her own or another occupation on a part-time or full-time basis during the benefit waiting period and beyond.

The plan administrator did not abuse its discretion by failing to consider whether Mead was residually disabled when Mead did not seek a determination that she was residually disabled, and did not produce evidence that she met the definition of "residually disabled" through the benefit waiting period and beyond.

### H.   Rejection of Reports of Vocational Counselor Parker

Mead contends that the appeal committee unreasonably rejected the series of opinions by James Parker submitted on her behalf.  The appeal committee supplied several reasons why it rejected Parker's opinions.  Mead's challenge amounts to a disagreement with the appeal committee's criticisms of the Parker opinions.  The Court finds no abuse of discretion in the rejection.

### I.   The Appeal Committee's Treatment of Dates of Disability

The appeal committee noted, accurately, that Mead claimed a disability date of January 28, 2003, for purposes of obtaining LTD benefits, the date she submitted her claim.  It proceeded to discuss several alternate dates, which it characterized as dates on which Mead claimed she became disabled, implying that the different dates are an indication that Mead's reports of her

condition lacked credibility.  The appeal committee concluded
that it was unable to establish a single date of disability, and
that there was no evidence that her condition deteriorated on or
about January 28, 2003.  R. at 2921.

Mead argues that ReliaStar Life abused its discretion and
acted arbitrarily and capriciously by requiring her to show a
change in her condition on this date, a requirement not appearing
in the Plan.  ReliaStar Life concedes that Mead need not show a
single date of disability preceded by a change in condition.
Def.'s Mem. in Response to Pl.'s Mot. Summ. J. 19, ECF No. 93.
The Court notes that the appeal committee devoted several pages
of its analysis to a misleading discussion of an irrelevant
issue, in an apparent attempt to cast doubt on Mead's
credibility.

Mead has consistently maintained that her condition pre-
dated her claimed date of disability, that she worked for some
years despite increasing pain, that she accepted an offer to
terminate her employment, and that she claimed January 28, 2003,
as her date of disability to qualify for benefits pursuant to the
Plan's conditions.  *See*  R. at 15.

The injection of irrelevant and misleading material into the
appeal committee's denial is further evidence that its conflict
of interest affected the benefits decision.  *See Durakovic*, 609
F.3d at 139.

58

**IV.  Conclusion**

Taken in combination, the appeal committee's treatment of 1) the physical requirements of Mead's own occupation; 2) her complaints of pain; and 3) her ability to perform the duties of her own occupation, demonstrate that ReliaStar Life's conflict of interest has influenced the proceedings.  *See Glenn*, 554 U.S. at 118.  It is difficult to assign a different interpretation to its rejection of any medical opinion put forth by the claimant, its selective editing of the reports that it relied upon, and its inconsistent treatment of the standards it purported to rely upon.  For example, the appeal committee stated that it credited only reports or opinions that dealt with the relevant time period in 2003 unless, like the Labor Market Survey or Dr. McPhee's record review, the report or opinion didn't confine itself to the relevant time period.  And its statement is belied by the fact that it refused to acknowledge Dr. Sheth's record review and resultant opinion which unquestionably dealt with the relevant time period.  Even under a strictly deferential review, however, according no weight to the conflict of interest, ReliaStar Life's denial of LTD benefits under the "own occupation" provision of the Plan was arbitrary and capricious, for the reasons previously stated.

Mead's motion for summary judgment requested judgment in her favor awarding her benefits retroactive to her first date of

eligibility in the amount of $15,000 per month, plus prejudgment interest at the Vermont statutory rate, plus costs of this litigation and attorneys' fees.  Her brief however does not address the benefit calculation, an appropriate prejudgment rate, or the issue of attorneys' fees.  Nor, understandably, has ReliaStar Life responded to Mead's motion on these points.

A district court has discretion to allow attorneys' fees and costs as well as prejudgment interest in an ERISA case.  *See e.g.*, *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 138-39 (2d Cir. 2000).  The Court will entertain an application from Mead, adequately supported, for both.

"[A] remand of an ERISA action seeking benefits is inappropriate 'where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable.'"  *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) (quoting *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 51 n.4 (2d Cir. 1996); *see also Miller v. United Welfare Fund*, 72 F.3d 1066, 1075 (2d Cir. 1995) (Calabresi, J. concurring in part and dissenting in part) ("[W]hen the [plan administrator has] demonstrated a manifest unwillingness to give fair consideration to evidence that supports the claimant, the claim should not be returned to the plan administrator.").  A denial of "own occupation" benefits based on the record was unreasonable, and

remand for further consideration of this issue is inappropriate.

The appeal committee also decided, based solely on its adverse determination of Mead's "own occupation" claim, that she was not totally disabled from any occupation once the own occupation benefits period lapsed.  Because it is possible that ReliaStar Life could demonstrate that substantial evidence supported a denial of benefits under the "any occupation" provision of the Plan, the matter will be remanded for ReliaStar Life to make this determination.  *See Pepe v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 559 F.3d 140, 149 (2d Cir. 2009).

The appeal committee did not address the amount of LTD benefits payable to Mead, because it determined that she was not eligible for benefits at any time.  This matter also must be remanded to ReliaStar Life for its determination.  *See id.*

Accordingly, the matter is remanded to ReliaStar Life, with directions to calculate and award LTD benefits for the Plan's 24-month "own occupation" period, from July 29, 2003, to July 29, 2005, and to determine whether Mead is entitled to "any occupation" disability benefits under the Plan.

The clerk is directed to close the case.


Dated at Burlington, Vermont this 17th day of December,

2010.

<u>/s/ William K. Sessions III</u>
William K. Sessions III
Chief Judge