UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| SUSAN MEAD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 2:05-cv-332 |
| | : | |
| RELIASTAR LIFE INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

### OPINION AND ORDER

Plaintiff Susan Mead suffers from degenerative cervical disc disease.  She left her job as a corporate executive in 2000 at age 50, and filed a claim for disability benefits in 2003.  Having been initially denied such benefits, she commenced this action in 2005 under the Employment Retirement Income Security Act of 1974 ("ERISA") against Defendant ReliaStar Life Insurance Company ("ReliaStar Life").

Over the approximately ten years that this case has been litigated, there have been two remands to the plan administrator: first for a more complete explanation of the substantial evidence supporting the denial of benefits, and again because the denial of "own occupation" benefits was an abuse of discretion.  The current issues before the Court are: (1) the amount of "own occupation" benefits due, and (2) whether the denial of "any occupation" was warranted.  For the reasons set forth below, Mead's Motion for Summary Judgment on those issues is **denied**, ReliaStar Life's Motion for Summary Judgment is **granted in part**

**and denied in part**, and this matter is **remanded** to the plan administrator.

I.   **Factual and Procedural Background**

   A.   **Employment and Disability Plan**

Mead worked for ReliaStar Financial Corp. ("ReliaStar Financial") from August 1978 through December 2000.  At the time of her departure on December 31, 2000, she held an executive position as a Vice President of Brand Marketing and Strategic Planning.[1]  Her position reported to the company CEO, and she served on the boards of subsidiaries located in Minneapolis, Seattle, and Jericho, New York.

Mead's job involved participating in meetings for a substantial part of her day and extensive work at a computer. She was also required to travel by airplane one to two times per month, with such trips regularly taking three to four hours.  Her work day often extended beyond eight hours.

Mead's employment was governed by a written employment contract dated November 20, 1999, entitled Management Employment Agreement ("MEA").  The MEA was intended to protect Mead in the event of a change of control at ReliaStar Financial. Specifically, if Mead were to leave the company, the MEA entitled her to participate in any health, disability or life insurance

_____

[1]  ReliaStar Life refers to her position as MC/V Communications/Community Relations in Strategic Marketing.

plan as though she continued to be an executive of the company for three years following her departure or until her 65th birthday, whichever occurred first.

During 2000, ReliaStar Financial agreed to merge with ING Groep, N.V. ("ING"), a financial services company located in the Netherlands.  In connection with the corporate acquisition of ReliaStar Financial, Mead exercised her option to stop working for the company as of the end of 2000 and to receive payment under the terms of the MEA.  She received a lump sum severance payment of $819,783.33 in 2001, as well as additional sums as deferred compensation or bonuses.  Mead's total compensation in 2000 was $283,734.38, reflecting a salary of $192,450.00 plus a bonus of $91,284.38.  There is no dispute that under the MEA, she was entitled to disability coverage for three years after her departure.  Mead was 50 years old when she left ReliaStar Financial.

ReliaStar Life provided a Long Term Disability ("LTD") Plan (the "Plan") to ReliaStar Financial's employees.  The Plan provided that for the first 24 months of an employee's disability, "Total Disability" would be defined as the inability to perform the essential duties of the employee's "own occupation" due to sickness or accidental injury.  After 24 months, "Total Disability" was defined as the inability to work at "any occupation" for which the employee was "or could

reasonably become qualified to do by education, training or experience."  ECF No. 165-1 at 16.

The Plan's Schedule of Benefits provided that for Total Disability, an individual would ordinarily be covered under a Base Plan which provided a Monthly Income Benefit of "[t]he lesser of 40% of your Basic Monthly Earnings or $15,000.00, minus Other Income."  *Id.* at 5.  Basic Monthly Earnings was defined as the "salary or wage you receive for work done for the Policyholder."  *Id.*  Basic Monthly Earnings included bonuses "for those employees with a written bonus agreement that is specifically based on sales of ReliaStar Financial . . . products and/or products of a ReliaStar Financial . . . subsidiary," but did not include, among other things, incentive compensation.[2] *Id.*

**B.   Claim for Benefits**

Mead has not engaged in any work, aside from volunteering at an art gallery, since her departure from ReliaStar Financial in December 2000.  A magnetic resonance imaging ("MRI") test in January 2001 showed moderately severe degenerative disc disease at multiple levels of Mead's cervical spine.  On January 28,

---

[2]   In its previous ruling, the Court concluded that the "record does not reflect that Mead had a written bonus agreement specifically based on sales of ReliaStar Financial products and/or products of a ReliaStar Financial subsidiary.  It does appear that at least some of the bonuses Mead received over the years were incentive compensation." *Mead v. Reliastar Life Ins. Co.*, 755 F. Supp. 2d 515, 519 n.1 (D. Vt. 2010) (citing the record at Mead Bates No. 536).

2003, she submitted a claim for LTD benefits based on
fibromyalgia and degenerative cervical disc disease.  As part of
her claims, she submitted an Activities of Daily Living Statement
in which she stated that she suffered from constant back and neck
pain and had experienced no improvement in her condition over the
previous two years.  Mead explained that she did aerobics four to
five times per week, weights two to three times per week, and
yoga.  Her daily activities included driving, laundry, garden
work, washing dishes, preparing meals, shopping, helping her
child, reading, watching TV and movies, and doing crafts.  Mead
also reported that she could not sit for longer than an hour
without a substantial increase in pain.

In February 2003 Mead's attending physician, Dr. Hannah
Rabin, completed a statement in connection with the claim
identifying the primary diagnosis as degenerative disc disease.
Dr. Rabin opined that Mead could tolerate sitting for three to
four hours, standing for one to two hours, and walking for one to
two hours.  Mead received no reduction in pain from an epidural
steroid injection in February 2003, while a medial branch nerve
block in April 2003 gave her limited relief.  In May 2003, Dr.
Michael Borrello performed a selective nerve root injection.

Dr. Rabin referred Mead to the Spine Institute of New
England, where Mead saw Dr. S. Elizabeth Ames in May of 2003.
Dr. Ames reviewed the 2001 MRI and x-ray films, obtained new

cervical spine films, and confirmed a diagnosis of multilevel degenerative cervical discs with pain resulting from the disc degeneration.  Dr. Ames discussed surgical fusions with Mead, but felt that this would not provide complete relief because of the multiple levels of discs involved.

After receiving Mead's claim, ReliaStar Life contracted with an outside medical consultant from Behavioral Management, Inc. ("BMI").  Dr. Mark Johnson, an internist, reviewed Mead's medical records and her application for LTD benefits.  Dr. Johnson concluded, after speaking with Dr. Rabin,[3] that Mead's reported inability to tolerate periods of sitting, standing, or walking was unsupported by the medical evidence.  Dr. Scott M. Yarosh, a physician and psychiatrist also affiliated with BMI, reviewed Mead's records from a psychiatric and medical perspective and concluded that there was a psychological component to her chronic pain.

On August 28, 2003, ReliaStar Life denied Mead's claim for LTD benefits.  The benefits specialist who handled her claim concluded that Mead's medical records did not support a finding of total disability from performing her own occupation.  No determination was made at that time with regard to "any occupation" benefits.

---

[3]  Dr. Rabin later attested that Dr. Johnson misreported their conversation.

On October 29, 2004, Mead appealed the denial.  The appeal committee permitted Mead to submit additional information. Accordingly, Mead provided a supplemental report from Dr. Rabin, the results of a Functional Capacity Evaluation ("FCE") conducted in October 2003, and a Vocational Analysis Report.  Mead also provided additional medical records from Drs. Ames and Borrello in support of her claims.

In July 2003, Mead underwent a work rehabilitation evaluation at the Fletcher Allen Work Enhancement Rehabilitation Center ("WERC").  On July 22, 2003, WERC's occupational therapist reported that Mead was "currently unable to work due to significantly decreased positional tolerances of sitting, standing and walking, stooping, reporting all of these cause increased pain just after a short time of being in this position."  In August 2003, Mead participated in a three-week "work hardening" program at WERC that included physical therapy, occupational therapy, and counseling.  On August 21, 2003, she reported that her tolerance for sitting, standing, walking and driving had improved as a result of participation in the program.[4]  One month after leaving the program, Mead returned to

---

[4]   The WERC data collection forms show reported positional tolerances on July 1, 2003 of 30 minutes for sitting, 30 minutes for standing, 60 minutes for walking and 15 minutes for driving.  On August 21, 2003, Mead's reported positional tolerances were 120 minutes for sitting, 60 minutes for standing, 120 to 180 minutes for walking and 180 minutes for driving.

WERC for an FCE.  The FCE indicated that Mead's tolerances had
deteriorated since leaving the program.

In April 2004, Mead had another MRI which confirmed
multilevel degenerative disc disease, involving the C3-4, 4-5, 5-
6 and 6-7 levels.

As part of its review of Mead's appeal, the appeal committee
retained physician and attorney Dr. Mitchell Nudelman to perform
a medical records review.  Dr. Nudelman, a primary care
physician, consulted with unnamed specialists and found
insufficient information to support Mead's claim of disability.
In a letter dated August 13, 2004, the appeal committee upheld
the initial decision denying "own occupation" benefits.

C.   **Mead's Lawsuit and the Court's First Ruling**

Mead filed suit against ReliaStar Life on December 29, 2005,
seeking recovery for LTD benefits pursuant to Section
502(a)(1)(B) of ERISA.  *See* 29 U.S.C. § 1132(a)(1)(B).
Magistrate Judge Niedermeier issued a Report and Recommendation
("R&R") on January 29, 2008, recommending that ReliaStar Life's
motion for summary judgment be denied, that Mead's motion for
summary judgment be granted and her claim remanded to the plan
administrator.  Both parties objected to the R&R.

On March 27, 2008, this Court issued a Memorandum and Order
accepting the R&R in part.  The Court found that it was unclear
"whether [ReliaStar Life had] rejected the findings that Mead

8

cannot perform full-time sedentary work, or whether, and on what basis, it concluded that Mead enjoyed a particular type of sedentary occupation that afforded her the flexibility to sit only for limited periods of time." ECF No. 54 at 8. The Court similarly found it "impossible to tell what evidence was credited and what evidence rejected in order to arrive at the decision to deny long-term disability benefits." *Id.* at 10. Consequently, the Court was unable to find substantial evidence supporting the denial of benefits, and remanded the case to the plan administrator.

### D.   The First Remand

Following remand, Mead's counsel submitted additional medical records and vocational reports to ReliaStar Life. These included records from Dr. Rabin; records from Dr. Mark Bucksbaum; an Independent Medical Examination ("IME") by a physical medicine and rehabilitation specialist; and a vocational assessment report. In 2005, Dr. Rabin had completed a Residual Functional Capacity Questionnaire for Mead's Social Security Disability Income ("SSDI") claim. In that questionnaire, Dr. Rabin concluded that Mead could only sit and stand for 20 minutes at a time, and could not sit for more than two hours in an eight hour work day. Dr. Rabin further indicated that Mead would need to a take a break every 30 to 60 minutes, that breaks would last from five to fifteen minutes, and that Mead would likely miss three

9

days of work per month due to her pain issues.

Dr. Bucksbaum completed a disability evaluation for Mead on April 3, 2008.  In the course of doing so, he reviewed her medical records between 2000 and 2008.  He also administered a total pain impairment instrument and concluded that Mead's score indicated moderately severe pain.  Based upon his evaluation and the records review, Dr. Bucksbaum opined that Mead was unable to meet the essential elements of her prior employment as a strategic marketing executive.

Vocational consultant James Parker completed a vocational assessment report for Mead on May 22, 2008.  Parker observed that Mead's records documented the fact that she was unable to sustain a regular eight-hour, five-day work schedule in a sedentary occupation.  He further noted that a self-paced and self-scheduled exercise program had no bearing on an individual's ability to work at a sedentary occupation.  Parker concluded that Mead could not perform any full-time sedentary occupation at that time.

ReliaStar Life retained Vocational Directions, LLC to contact employers in the financial services industry to ascertain the physical demands of an executive in strategic marketing.  Fourteen employers were contacted.  Half of those employers reported that a similar executive position was sedentary, that the employee could alternate sitting or standing, that air travel

constituted ten percent or less of the job requirements, and that
accommodations were provided.  Other survey responders indicated
that their positions involved significant travel, or that
accommodations to allow sitting and standing at will would be
difficult.

On September 15, 2008, Dr. Neil McPhee of Professional
Disability Associates reviewed Mead's records at the request of
ReliaStar Life.  Dr. McPhee concluded that any particular
positional intolerance could be accommodated with changes of
position and an ergonomic work station, and that Mead's exercise
regimen demonstrated her ability to perform at an activity level
greater than that required for a sedentary occupation.  He
concluded that Mead's complaints were not credible, and that her
walking, exercising, hiking and yoga demonstrated that she was
able to perform the duties of a sedentary occupation for a
continuous period of at least six months.

In a letter dated September 15, 2008, ReliaStar Life
reaffirmed its prior decision to deny Mead LTD benefits.  It
rejected portions of the opinions of Dr. Rabin, the FCE, and the
vocational analysis by James Parker as inconsistent with the
findings of the WERC program notes.  It stressed that as of
August 2003, according to the WERC program documentation, Mead
had progressed to being able to tolerate two hours of sitting,
one hour of standing, two to three hours of combined walking and

standing and three hours of driving.

ReliaStar Life again concluded that Mead's program of exercise was inconsistent with her claim of chronic pain from cervical disc degeneration.  It chose to rely upon the record reviews of Drs. Johnson and Yarosh, who agreed that her claimed limitations were inconsistent with an individual who could engage in physical exercise and were not supported by any objective evidence in the medical records.  As to her own occupation, ReliaStar Life concluded that Mead "had a particular type of sedentary job which allowed her to alternate sitting and standing at will."  This conclusion was based on Mead's description of her job as flexible, and upon information from an administrative assistant at ING.

Mead appealed ReliaStar Life's adverse decision on March 10, 2009.  On April 30, 2009, she attended an IME at the appeal committee's request with Dr. George White, Jr.  Dr. White noted that Mead appeared to sit comfortably for 30 minutes during the interview, and based upon her own report that she had been "pretty much the same" for the ten or twelve years, concluded that Mead's pain would not have prevented her from performing sedentary work.

On May 26, 2009, Mead attended another IME, again at the appeal committee's request, with neurologist Dr. Kevin Sheth. Dr. Sheth concluded that Mead's reports of pain symptoms were

supported by her imaging findings and were typical for patients with severe degenerative disc disease.  Periods of prolonged sitting would exacerbate the disease and the pain symptoms.  He concluded, based on his record review, that in 2003 Mead would have experienced back pain and spasms after sitting for prolonged periods, and would have been restricted to performing sedentary tasks for limited periods in the 30 to 60 minute range, and that even those would require opportunities to take 30 to 60 minute breaks.

On September 30, 2009, the ReliaStar Life appeal committee affirmed the September 2008 adverse determination.  The committee rejected Dr. Rabin's assessments as inconsistent and not based on objective testing.  The committee found the WERC assessments from August 2003 as most reliable, and again rejected the followup FCE at WERC because it failed to discuss the progress Mead had made during the work hardening program.

The appeal committee rejected Dr. Bucksbaum's report because he failed to consider the WERC program results, and because his examination occurred five years after Mead's claimed date of disability.  It even found that Dr. Sheth was not reliable because his review, commissioned by the Defendant, occurred six years after Mead's claimed date of disability.[5]  It also

---

[5]  As the Court noted previously, the appeal committee found its own IMEs unreliable even though the physicians were instructed to evaluate Mead's pain and functional impairment during the relevant time period.  *Mead*, 755 F. Supp. 2d at 528.

13

concluded that the labor market survey performed in 2008 was an
accurate comparison with Mead's job in 2000, and that
accommodations would allow her to sit and stand at will.
Finally, the appeal committee rejected Mead's complaints of pain,
finding that they were "not supported by the evidence as she
takes little if no medication for pain or inflammation and is
able to perform a wide range of activities of daily living, many
household chores and recreational and exercise activities . . .
that require a much higher level of exertion to perform than is
required by her own occupation."

**E.   The Court's Second Ruling**

In an Opinion and Order dated December 20, 2010, the Court
reversed the appeals committee and granted Mead 24 months of "own
occupation" LTD benefits for the period July 28, 2003 to July 28,
2005.  *Mead*, 755 F. Supp. 2d 515.  In its ruling, the Court paid
particular attention to the conclusions of Dr. Sheth, and the
committee's reliance upon its other hired reviewers.

> Dr. Johnson based his opinion largely on his
> misrepresentation of a telephone conversation with
> Mead's treating physician, and he did not have the
> benefit of the data from the work hardening program
> Mead attended in the summer of 2003.  Dr. Yarosh did
> not review Mead's entire medical file.  Dr. Nudelman
> simply presented the views of his anonymous
> consultants.  In 2008 Dr. McPhee reviewed Mead's entire
> claim file, not just the medical records from 2003,
> just as Dr. Sheth did in 2009.  The appeal committee
> neglected to explain the basis for finding Dr. Sheth's
> record review unreliable, stating only that Dr. Sheth's
> examination of Mead took place six years after her
> claimed date of disability.

14

> The appeal committee offered no reasonable basis for
> its selective and inaccurate summary of the WERC
> evidence.  Taken in its entirety, the evidence from the
> WERC program showed that Mead could not work full-time
> at her sedentary occupation before, during and after
> the beginning of July 2003 through the end of September
> 2003.  This selective if not distorted treatment of the
> file reviews and the WERC program evidence not only
> undermines the rationality of the appeal committee's
> determination; it lends support to the argument that
> ReliaStar Life's structural conflict of interest should
> weigh more heavily in the Court's arbitrary and
> capricious review.

*Id.* at 538-39.  The Court also found that the record supported

Mead's complaints of pain.

> The administrative record reflects that there was ample
> objective confirmation of Mead's pain, including from
> the physician deemed most knowledgeable about her pain.
> The record also reflects that the appeal committee's
> rejection of Mead's severe neck and upper back pain as
> unsupported by the evidence, is itself unsupported by
> the evidence.  Accordingly, the Court finds that the
> plan administrator's rejection of Mead's severe
> cervical pain was arbitrary and capricious.

*Id.* at 536.[6]

   **F.   The Second Remand**

      **i.   Amount of "Own Occupation" Benefits**

   Following the Court's remand, ReliaStar informed Mead that

her monthly benefit for "own occupation" benefits would be $6,500

per month subject to offsets for other income.  This amount was

---

   [6]   ReliaStar Life appealed the Court's ruling to the United
States Court of Appeals for the Second Circuit.  The appellate court
dismissed the appeal for lack of jurisdiction, holding that because
this Court had remanded Mead's claim to the plan administrator, there
was no final order from which to appeal.  *Mead v. ReliaStar Life Ins.
Co.*, 768 F.3d 102, 113 (2d Cir. 2014).

based upon Mead's last salary amount of $195,000, which resulted in Base Monthly Earnings of $16,250.  The Policy provided a monthly benefit of 40% of that amount, or $6,500.  ReliaStar also informed Mead that it would review her claim for "any occupation" benefits, and that she could submit additional materials relevant to that issue.

Mead filed an administrative appeal of the "own occupation" determination on January 24, 2011, claiming that she was entitled to the policy maximum of $15,000 per month.  In support, she presented three arguments.  She first claimed that she received compensation of over $1 million in 2001, thus entitling her to the maximum benefit.  Second, she claimed that her taxable income for her last three years of employment entitled her to the maximum benefit.  Third, she noted that a claim representative had stated her yearly earnings as $276,355, and not $195,000.

On February 23, 2011, ReliaStar Life affirmed its decision that Mead was entitled to "own occupation" benefits of $6,500, confirming that Mead's last salary amount was $195,000 and that she had paid Policy premiums based upon that amount.  ReliaStar Life concluded that annual bonuses were not included in Basic Monthly Earnings because they were not based on sale of ReliaStar Financial products.  Deferred compensation and severance payments were also excluded because they did not represent salary or wages for work performed.

### ii.  Eligibility for "Any Occupation" Benefits

To evaluate Mead's "any occupation" claim, ReliaStar Life contracted with Dr. Richard Kaplan, board certified in pain management and physical medicine and rehabilitation, and Dr. William Andrews, board certified in orthopedic surgery, to review her file.  Both doctors found that Mead's complaints were out of proportion to her medical conditions, and that she could have worked full-time as of July 29, 2005 so long as she could change positions for one minute after each hour of sitting.

ReliaStar also commissioned a rehabilitation counselor, Scott Sipe, to perform a labor market survey.  Sipe's task was to determine whether positions existed in 2005 that Mead could have performed given her limitations and that would have paid her at least 60% of her prior salary.  While most employers declined to provide responses about the duties of their executives, one insurance company reported that Mead could work as a senior executive and fulfill the duties of such a position notwithstanding her limitations.

On July 29, 2011, ReliaStar Life denied Mead's claim for "any occupation" benefits.  The decision relied primarily upon the opinions of Drs. Kaplan and Andrews, and the Sipe labor market survey.  The decision also determined that although Mead claimed that horseback riding was recommended as therapeutic, the person who made the recommendation was not a medical professional

and the activity was instead recreational.

Mead filed an administrative appeal on January 24, 2012. The cover letter from Mead's counsel relied heavily upon this Court's prior ruling as to "own occupation" benefits, and criticized ReliaStar Life's reviewing physicians as not credible. The letter also quoted a substantial portion of Parker's amended report dated December 1, 2011. Mead herself submitted a declaration stating that it was painful for her to sit, travel by car or air, or stand for more than ten minutes – including at a standing work station. Light housework and cooking were not possible. She reported that she was still riding horses, and that such activity diminished her pain for approximately one hour. Her appeal included an FCE conducted in 2011, and commentary on that FCE by an occupational therapist. The FCE noted that Mead was observed sitting for 30 minutes, but the occupational therapist warned against extrapolating a two-hour exam to a full workday.

While Mead's appeal was pending, ReliaStar Life transferred processing of disability claims to Disability Reinsurance Management Services, Inc. ("DRMS"). DRMS has agreed to act as an ERISA fiduciary, investigating and evaluating disability claims on ReliaStar Life's behalf. ReliaStar Life pays DRMS for this work, and the compensation is not based upon the outcomes of the claims determinations. ReliaStar remains obligated to pay

benefits under the Policy.

Upon receiving Mead's appeal, DRMS obtained an independent medical review from Dr. Milton Klein.  Dr. Klein is board certified in pain medicine and physical medicine and rehabilitation.  He reviewed Mead's file, including her medical records, independent medical exams, FCEs and vocational opinions. Dr. Klein concluded that Mead's reports of pain were inconsistent with her high level of recreational activities exercise, and were unsupported by clinical evidence.  Mead responded to these conclusions, labeling them "not credible in light of all the medical evidence."  She did not offer additional medical evidence or opinion.

On April 2, 2012, DRMS affirmed the denial of Mead's "any occupation" claim.  Mead notes that DRMS sent the letter on ING letterhead.  The decision letter cited only Dr. Klein by name and adopted the conclusion that as of 2005 Mead could have worked at a sedentary occupation where she could change positions for one minute each hour.  The letter also noted Dr. Klein's opinion that Mead's complaints were inconsistent with her daily activities and exercise regime in 2005.  The two-page letter to Mead's attorney otherwise stated, in relevant part:

> On July 29, 2011, you were advised a review was
> completed regarding Ms. Mead's request for Long Term
> Disability benefits from July 29, 2005.  The review
> included a dual independent review as well as a labor
> market survey.  In part, the review concluded Ms. Mead
> was capable of working in a full-time sedentary

capacity with restrictions of lifting up to ten pounds
frequently or twenty pounds occasionally as well as
sitting on hour at a time with changing positions for
one minute each hour. . . .

[After Mead appealed,] Ms. Mead's entire claim file was
transferred to me to complete the appellate review.  As
part of the appeal review an independent medical review
[by Dr. Klein] was requested. . . .

Based on a complete and thorough review of the medical
documents received, we conclude there are no
restrictions or limitations preventing Ms. Mead from
performing any occupation from July 28, 2005 and
continuously after.  Because our review concluded no
impairment was supported, and no benefits were payable
under the Policy, we did not proceed with an additional
vocational review.

ECF No. 157-3 at 116-17.  The determination letter did not
address the opinions of treating physicians, Mead's own
declaration, Parker's conclusions, or this Court's general
findings regarding Mead's disability.

### G.   Mead's Current Challenge

Mead now argues that the DRMS decision is not consistent
with the Court's prior determination regarding her ability to
work in a sedentary occupation.  Mead also contends that the DRMS
letter failed to explain how it weighed and considered evidence
in the medical records.  Mead argues that this failure to discuss
any of the specific medical records, and most significantly those
of treating physicians, constituted an abuse of discretion.

ReliaStar Life responds that much of the medical record
pertained to 2003, and therefore did not need to be referenced in
the determination letter.  More generally, ReliaStar Life submits

that DRMS provided specific reasons as required by law, in that
it cited its review of the entire record and referred to Dr.
Klein's report.

## II.  ERISA Standard of Review

ERISA's Section 502(a)(1)(B) permits a plan participant to
bring a civil action to recover benefits due to her under the
terms of her plan, to enforce her rights under the terms of the
plan, or to clarify her rights to future benefits under the terms
of the plan.  29 U.S.C. § 1132(a)(1)(B).  The standard of review
for a § 1132(a)(1)(B) action is *de novo*, "unless the benefit plan
gives the administrator or fiduciary discretionary authority to
determine eligibility for benefits or to construe the terms of
the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,
115 (1989).  Where a benefit plan confers discretionary authority
on the plan administrator, a reviewing court's role is limited to
determining whether the administrator abused its discretion, *id.*
at 111, by subjecting the plan administrator's decisions to
arbitrary and capricious review. *Durakovic v. Building Serv. 32
BJ Pension Fund*, 609 F.3d 133, 137 (2d Cir. 2010).

Under this deferential standard, "a court may not overturn
the administrator's denial of benefits unless its actions are . .
. 'without reason, unsupported by substantial evidence or
erroneous as a matter of law.'" *McCauley v. First Unum Life Ins.
Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (quoting *Pagan v. NYNEX*

*Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance."  *Durakovic*, 609 F.3d at 141.  The plan administrator bears the burden of proving that the deferential standard of review applies.  *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)*, 70 F.3d 226, 229 (2d Cir. 1995).

The Court previously applied the abuse of discretion standard with regard to Mead's "own occupation" benefits.  Mead now argues that a *de novo* standard of review should apply to the "any occupation" determination.  Her arguments are twofold. First, she claims that in *CIGNA Corporation v. Amara*, 131 S. Ct. 1866, 1878 (2011), the Supreme Court altered the ERISA landscape when it held that a Summary Plan Description ("SPD") does not give a plan administrator discretionary authority unless the SPD is specifically incorporated into the plan instrument.  The Supreme Court reasoned that "the summary documents, important as they are, provide communication with beneficiaries *about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)."  *Id.*

The parties disagree as to whether the SPD is part of ReliaStar Financial's ERISA plan.  In *Amara*, the plan sponsor issued a series of SPDs that contradicted the plan instruments.

22

No such conflict has been presented here.  *See, e.g., Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 335 (E.D.N.Y. 2013) (distinguishing *Amara* on the ground that "there is no admissible proof demonstrating that 'the Plan' conflicts with any of the documents in the Administrative Record received by the plaintiff").  In this case, the SPD is in the final section of a document entitled "Long Term Disability Plan," and is included the document's table of contents.  ECF No. 165-1.  The SPD contains a detailed description of claim procedures, and a statement of ERISA rights.  These pieces of information are not provided elsewhere in the Plan.  ReliaStar Life's final discretionary authority is set forth solely in the SPD.

The fact that the SPD and the Long Term Disability Plan are in a single document, with some critical information provided exclusively in the SPD, supports ReliaStar's assertion that the SPD is a part of the Plan.  Indeed, unlike *Amara*, the SPD complements, rather than conflicts with, other information in the Plan and is bound as part of the Plan documents.  It is therefore reasonable to view the SPD as part of the Plan itself.  *See, e.g., Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1131 (10th Cir. 2011) ("We interpret *Amara* as presenting either of two fairly simple propositions, given the factual context of that case: (1) the terms of the SPD are not enforceable when they conflict with governing plan documents, or

(2) the SPD cannot create terms that are not also authorized by, or reflected in, governing plan documents.  We need not determine which is the case here, though, because the SPD does not conflict with the Plan or present terms unsupported by the Plan; rather it is the Plan.").

Mead's second argument for *de novo* review is that even if ReliaStar had discretion, it failed to exercise it.  After the Court's remand, the claims determination as to "any occupation" benefits was made by DRMS.  Mead notes that under ERISA, discretionary authority can only be delegated "pursuant to a procedure specified in the plan," 29 U.S.C. § 1102(a)(2), and that ReliaStar Life has not provided documentation of any such procedure or delegation.

ReliaStar Life contracted with DRMS and authorized it to perform a range of tasks, including adjudicating claims.  At the same time, ReliaStar retained the right to instruct DRMS as to how to administer claims, and to make final decisions when the two companies disagreed about the proper outcome of a claim.[7]  Accordingly, ReliaStar Life retained its duty as the ultimate discretionary authority, and did not cede that entire authority to DRMS.  The Court will therefore continue to apply an arbitrary and capricious standard.

---

[7]  The agreement between DRMS and ReliaStar Life has been filed under seal, ECF No. 162-5, and confirms that ReliaStar Life retained the right to overturn any DRMS decision.

When applying this standard, potential conflicts of interest are also a consideration.  "If 'a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.'" *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone*, 489 U.S. at 115).  "[A]n ERISA-fund administrator that 'both evaluates claims for benefits and pays benefits claims' is conflicted, and . . . a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis." *Durakovic*, 609 F.3d at 138 (quoting *Glenn*, 554 U.S. at 111-15).

Here, the parties agree that ReliaStar Life operates under a conflict of interest where it both evaluates claims for benefits and pays benefits claims.  *See Glenn*, 554 U.S. at 112.  With regard to any determinations made by DRMS, however, ReliaStar claims there is no conflict because DRMS does not pay the benefits claims.  In any event, ReliaStar Life retained ultimate discretionary authority, thus raising the potential for a conflict to which the Court must be sensitive as it reviews the denial of benefits.

## III. Cross-Motions for Summary Judgment

### A.   Legal Standard

Summary judgment is appropriate "if the pleadings, the

25

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  In determining whether a genuine issue of material fact exists on cross-motions for summary judgment, the Court must resolve all ambiguities, and draw all inferences, against the party whose motion is under consideration. *See, e.g.*, *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 283-84 (2d Cir. 2005).  "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Durakovic*, 609 F.3d at 137 (quotation marks and citation omitted).

"The same standard applies where, as here, the parties filed cross-motions for summary judgment." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000)).  Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121 (citation omitted).

B.    Amount of "Own Occupation" Benefits

It is undisputed that the Plan provides for a monthly disability benefit in the amount of "[t]he lesser of 40% of your Basic Monthly Earnings or $15,000, minus Other Income."  Basic Monthly Earnings are defined as "for the full time employee . . . only salary or wage you receive for work done for the Policyholder."  Basic Monthly Earnings do not include bonuses unless they are paid under a "written bonus agreement that is specifically based on sales of ReliaStar Financial Corp. products and/or products of a ReliaStar Financial Corp. subsidiary." "[I]ncentive compensation" and "other forms of compensation" are expressly excluded.

According to Kim Shattuck, ING America's Head of Benefits, Mead's last salary in 2000 was $195,000.  Mead does not dispute that this was, in fact, her salary, although her earned and taxable income was higher.  Mead received a bonus that year, but the bonus was not based on a written agreement or upon the sale of ReliaStar products, and thus did not qualify as part of Base Monthly earnings.  Indeed, the record indicates that Mead was paid bonuses on an "incentive" basis.  *See supra* footnote 2. Furthermore, according to ReliaStar's underwriting department, Mead paid disability insurance premiums on the basis of the $195,000 annual salary.

ReliaStar calculated Mead's monthly benefit based upon her

final salary of $16,250 per month, resulting in a 40% benefit amount of $6,500 per month.  Mead's arguments for additional sums based upon her bonuses, her severance package, and her taxable income (including bonuses) during her final years of employment are unsupported, even under a *de novo* standard, by the clear terms of the Plan.  Summary judgment is therefore **granted** in favor of ReliaStar Life on that issue.

### C.   Entitlement to "Any Occupation" Benefits

The next question is whether Mead is entitled to "any occupation" benefits.  It is the claimant's burden to prove that she is eligible for disability benefits.  *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 488 (2d Cir. 2013) (citing *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002)).  Under the "any occupation" standard as defined in the Plan, Mead must show by a preponderance of evidence that she was "unable to work at any occupation [she had] or could reasonably become qualified to do by education, training or experience."

ReliaStar Life's briefing argues that as a highly-educated senior executive leading "an active life of horseback riding, exercising and other physical activities," Mead "certainly can work in some occupation even if she could not meet the specific sitting requirements of her former job."  ECF No. 164 at 9.  Mead submits that her physical activities are irrelevant to her ability to sit for long periods of time.  She also contends that

the most recent medical reviews were not credible, the denial of benefits was again arbitrary and capricious, and the Court should grant her "any occupation" benefits.

Under ERISA, a denial of benefits must "set[] forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. In 2008, this Court rejected a prior ReliaStar Life determination because it was "impossible to tell what evidence was credited and what evidence rejected in order to arrive at the decision to deny long-term disability benefits." The Court also criticized ReliaStar Life's disregard of Mead's complaints. ECF No. 54 at 12 ("Although ING was not required to believe Mead and her physicians, subjective descriptions of pain, if credible, are sufficient evidence of disability.") (citations omitted).

The Court further questioned the apparent assumption that volunteer work and a daily exercise regimen rendered Mead capable of sedentary work, stating that "the conclusion lacks any record evidence to support it. There is no evidence that Mead's sedentary job required physical ability or stamina." *Id.* More recently, the Court declined to give any weight to Mead's other physical activities, concluding that "[h]er level of physical activity has little to do with the essential duties of a sedentary occupation." *Mead*, 755 F. Supp. 2d at 534.

Defendants' current determination as to "any occupation"

benefits is similarly flawed.  First, it is not clear whether
DRMS gave any credence to Mead's own complaints of pain.  It is
well established that "'the subjective element of pain is an
important factor to be considered in determining disability.'"
*Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir.
2001) (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir.
1984)).  A plan administrator "must do more than simply point to
the subjective nature of the evidence when denying [a] claim.  It
must either assign some weight to the evidence or provide a
reason for its decision not to do so."  *Miles*, 720 F.3d at 487.
"[I]t is arbitrary and capricious to disregard evidence simply
because it is subjective."  *Id.* at 486; *Thurber v. Aetna Life
Ins. Co.*, 712 F.3d 654, 660 (2d Cir. 2013) (noting that the plan
administrator must give "sufficient attention to . . . subjective
complaints").

There is no question that Mead suffers from degenerative
disc disease resulting in significant pain, and that her pain
limits her ability to sit for extended periods of time.  Various
medical treatments, including epidurals and nerve blocks, have
provided only limited relief.  As to her other activities, the
Court has consistently rejected their relevance to the question
of working at a sedentary occupation.

Nonetheless, several of the physicians retained by the
Defendant were skeptical of Mead's pain on the basis of those

very activities.  Dr. Yarosh raised the possibility that some of
Mead's chronic pain could have a psychological component.  More
recently, Drs. Kaplan, Andrews, and Klein, each of whom were
retained by either ReliaStar Life or DRMS, concluded that Mead's
complaints were exaggerated.  None of these doctors met with Mead
personally to assess her complaints, and instead reached their
conclusions based solely upon records reviews.

The latest determination, set forth in the letter dated
April 2, 2012, does little to explain the dismissal of Mead's
subjective complaints other than to echo Dr. Klein's conclusions.
Dr. Rabin, Mead's treating physician, has repeatedly given
credence to Mead's experience of pain, but the plan
administrator's determination makes no reference to her
conclusions.  *See Black & Decker Disability Plan v. Nord*, 538
U.S. 822, 834 (2003) ("Plan administrators, of course, may not
arbitrarily refuse to credit a claimant's reliable evidence,
including the opinions of treating physicians.").  Nor does the
determination even mention Dr. Sheth, despite the Court's
considerable citations to his opinions in its 2010 ruling.

The determination's treatment of Mead's functional
capacities is also inadequate.  The DRMS letter states that it
received Mead's "entire claim file" and that its determination
was made after "a complete and thorough review of the documents
received."  However, the determination letter referenced only the

31

opinions of those doctors who participated in the final appeal.
None of those doctors were treating physicians, and there was
again no effort to explain away Dr. Sheth's conclusions.

The determination letter also fails to discuss either the
attributes of "any occupation" that would allow Mead to perform
full-time work, or the possibility of reasonable accommodations.
These omissions may be the result of the determination's complete
adoption of Dr. Klein's opinion that there are no restrictions or
limitations upon Mead's ability to perform sedentary work.  Given
the Court's previous conclusions about Mead's ability to engage
in such work, as well as several opinions in the record attesting
to Mead's physical limitations, the wholesale acceptance of Dr.
Klein's opinion without any discussion of job requirements or
reference to countering evidence constituted an abuse of
discretion.

The First Circuit recently held in the "own occupation"
context that "a reasoned determination" needs to include the
"material duties" of "the position as it is normally performed in
the national economy.  Only then can a claims administrator
distill the medical and vocational evidence, apply it to the
occupational profile, and make a reasoned determination of
whether or not the claimant is disabled."  *McDonough v. Aetna
Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015).  This same
logic holds true in the "any occupation" context, as a

description of material duties would be a necessary precursor to the disability analysis.  And yet in this case the final determination letter offered no discussion of the physical requirements of "any occupation."

Briefly stated, the DRMS determination is highly conclusory, and despite an expansive record, citing only one, non-examining reviewer by name.  No obvious credence is given to Mead's subjective statements of pain, to contrary medical reviews, or to this Court's previous findings with regard to Mead's limitations. Because the latest determination is cursory at best, this matter must once again be remanded for a more thorough analysis.

## IV.  Conclusion

Ultimately, the burden of proving disability is on the Plaintiff.  Furthermore, the standard of review is highly deferential, requiring only that "a reasonable mind might accept [the evidence] as adequate to support the conclusion reached by the administrator."  *Durakovic*, 609 F.3d at 141.  Applying this standard and viewing the undisputed facts in a light most favorable to ReliaStar Life, the Court finds on the current record that there are genuine issues of material fact prohibiting summary judgment in Mead's favor on the question of her entitlement to "any occupation" benefits.  That said, when the facts are viewed most favorably to Mead, Defendant's denial of "any occupation" benefits is not adequately supported by

substantial evidence for the reasons discussed above.  ReliaStar Life is entitled to summary judgment with regard to the amount of "own occupation" benefits, as its calculation is clearly supported by the terms of the Plan.

Accordingly, Mead's motion for summary judgment (ECF No. 159) is **denied**.  ReliaStar Life's motion for summary judgment (ECF No. 156) is **granted** with respect to the amount of "own occupation" benefits due, and is otherwise **denied**.  The case is remanded to the plan administrator for further proceedings consistent with this Opinion and Order.

DATED at Burlington, in the District of Vermont, this 10th day of July, 2015.


/s/ William K. Sessions III
William K. Sessions III
District Court Judge